JOHN L. BLACKMAN V. GEORGE F. WRIGHT, *et al.*, Appellees, DANIEL DULL AND NELLIE M. DULL, Appellants.

96  541
116  274
96  541
f132  86

**Jurisdiction in Rem.** D. procured a decree in New York setting aside a deed to Iowa land made by him to B. When this action was brought both D. and B. had parted with their titles. None of their grantees lived or were served in New York, and none appeared to the action, although B., the grantor of some of them, did appear. The judgment did not purport to act upon the land although it ordered B. who appeared to make deed to D. and enjoined said grantees from prosecuting an action in Iowa affecting said land or conveying or incumbering same. *Held*, the New York decree is void as to said grantees, for want of jurisdiction.

**Rescission.** A grantee cannot rescind a conveyance for land where he has slept upon his rights for three years after discovering the fraud, and has had transactions with the grantor which were inconsistent with an intention to rescind, or which at least show

that he was speculating as to whether he could realize more from certain deals with the grantor than from the rescission.

**Evidence: FRAUD.** The falsity of representations that one owned land and was a man of means, cannot be inferred from the mere fact that shortly after the transaction in the course in which they were made, he often borrowed money.

**SAME: ATTORNEY AND CLIENT.** Defendant's contention that plaintiff represented that he owned a greater per cent. of a title than he did in fact have, is not proven where plaintiff denies and the only other evidence for defendant is that of plaintiff's attorney who acquired his information from his client or papers placed in his possession by his client.

Deemer, J., took no part.

*Appeal from Pottawattamie District Court.*—HON. H. E. DEEMER, Judge.

TUESDAY, JANUARY 21, 1896.

*Flickinger Bros.* for appellants.

*Winfield S. Strawn* for appellees.

Kinne, J.—I. The pleadings in this case are elaborate, and the facts are many, and somewhat complicated. A thorough understanding of the case, and of the grounds upon which our conclusions rest, demands a quite full statement touching the matters in controversy. In 1887 plaintiff, a resident of the state of Nebraska, became acquainted with some of the heirs of one John Hopper, who died in the state of New York in 1706. These Hopper heirs (some two hundred in number) claimed an interest in certain land fronting on Broadway, in the city of New York. This claim seems to have been based upon the fact that in 1703 the Bloomingdale road, in said city, had been laid out upon land belonging to said Hopper, which road was in 1847 so widened and straightened as to leave a strip of ground lying between the lots fronting upon the old road and the east line of the new road (called "Broadway"),

which, in accordance with an act of the legislature of New York, reverted to the owners of the abutting lots. Plaintiff undertook, for a half interest therein, to recover this property for some of the Hopper heirs. In 1888 plaintiff interested E. R. Duffie, an attorney residing in Omaha, Neb., in his venture, and Duffie went to New York City, and spent some time in investigating the records, titles, etc. For his services in this behalf, Duffie afterwards demanded over five thousand dollars. Thereafter plaintiff made an arrangement with Charles Haldane, then of Council Bluffs, Iowa, and a member of the firm of Wright, Baldwin & Haldane, whereby Haldane was to share equally with plaintiff in the enterprise, and was to, and did, go to New York City to investigate the matter, to procure deeds from the Hopper heirs, and to prosecute suits in furtherance of their joint venture. Haldane, for some time after his removal to New York City, continued his firm relations with Wright and Baldwin, who were also interested in the contract with plaintiff. Plaintiff and Haldane, in the course of their investigations, found that Daniel Dull, a defendant herein, was in possession of a portion of the strip of land on Broadway heretofore mentioned, which plaintiff claimed was the property of these Hopper heirs. Dull was a tenant of one Lyon, who held title to the land. Twenty-four feet of the Broadway front of his premises were embraced in this disputed tract. Dull had erected a building upon this land, and by the terms of his lease his landlord had an option, at a certain time, to take the building and pay Dull twenty-two thousand dollars for it. The lease required Dull to erect a building to cost not less than twenty-five thousand dollars, but in fact the building had cost forty-five thousand dollars. In 1889 plaintiff and Haldane met Dull, and proposed to sell him the strip of ground belonging to the Hopper heirs. Dull informed them that he was only a tenant. Dull

knew Wright. The time when Lyon, the landlord, might exercise his option, was near at hand, and Dull was anxious to unload the building on to his landlord for thirty-five thousand dollars. He apparently saw in the proposition of Haldane and plaintiff the opportunity to further his designs in that direction, and entered into negotiations with them for the purchase of the interest which they represented in this disputed strip of ground which he was occupying. His object, no doubt, was to acquire the control of the Hopper title, and thus force his landlord to his terms. The result of the negotiation was that on June 28, 1889, Dull conveyed to plaintiff, by warranty deed, five hundred and fifty-one acres of land in Pottawattamie county, Iowa, and was to remove therefrom a mortgage for ten thousand dollars which covered the tract of land conveyed and other lands. He never did remove this incumbrance. As a part of the deal, Blackman executed to Dull a quitclaim deed to this disputed strip of ground which the latter was occupying as a tenant, which was placed in escrow with one King, who was a solicitor for Dull in New York City. As a part of the same transaction, Blackman gave Dull a mortgage on said disputed strip for ten thousand dollars, which was delivered to Dull. It is not clear as to how long this deed was to be held in escrow; probably, however, until Dull secured a settlement with his landlord, or until it was determined in the litigation which was expected to follow, that Blackman had title to the land. Dull, Blackman, and Haldane then set about getting the landlord to purchase the brick building which Dull had erected upon the lot, and also were going to convey to the landlord the title which Blackman had discovered to be in, and had acquired from, the Hopper heirs. There can be no doubt that so far, in

these negotiations, Blackman and Haldane were act-
ing as agents for Dull. Lyon, the landlord, however, did
not accede to their demands. Dull, all of this time, had
kept from his landlord the knowledge that he (Dull)
already had a mortgage on the disputed ground.
Finally, either Blackman or Haldane, or perhaps both,
without Dull's knowledge, sold to the landlord, for ten
thousand dollars, the same strip of land which they
had heretofore mortgaged to Dull. It is proper to say
that, when Dull entered into negotiations with Black-
man and Haldane, he claims that Blackman repre-
sented to him that he (Blackman) was a man of means,
that he had then eighty-six per cent. of the Hopper
title, and that he would prosecute the matter with due
diligence against the occupants and owners of the
strip. This claim is not acceded to by Blackman. Prior,
however, to deeding this strip to Lyon, the landlord,
and on August 8, 1889, Blackman had conveyed the
Iowa land received from Dull, by warranty deed, to
George F. Wright, of the firm of Wright, Baldwin &
Haldane, which deed was duly recorded. Blackman
claims that this deed was made under an arrangement
whereby Wright was to advance not exceeding ten
thousand dollars to further the enterprise. Wright
and Baldwin claim this deed was to secure about five
thousand dollars already advanced to Haldane, as well
as money afterwards to be advanced. It is reasonably
clear from the evidence that little if any money
was advanced by them to Blackman after this deed was
executed. Wright mortgaged the land to Askwith, a
clerk in his office, for five thousand five hundred dol-
lars. The latter however, never advanced any money,
the mortgage being made to enable Wright to raise
money from other parties. October 1, 1889, Blackman
conveyed the same land, by warranty deed, for a con-
sideration of fifteen thousand dollars to one Sav-
age, of Omaha, and January 1, 1891, Savage recon-

veyed it to Blackman. January 30, 1892, Blackman conveyed the same land to one Phelan, of Omaha, by warranty deed, which conveyance seems to have been originally made to secure a small loan of seventy-five dollars. August 27, 1892, Phelan mortgaged the land to Duffie for five thousand five hundred dollars, to secure payment of his fees as attorney for services which he had rendered Blackman. On September 15, 1892, it was agreed between Blackman and Phelan that this deed to the latter should convey absolute title, and that Phelan should pay Wright his claim for money advanced Haldane, Duffie's claim, and a claim for some one thousand dollars or more held by Savage, of Omaha, against Blackman, and to pay Blackman five hundred dollars, and to do certain other acts in the premises. September 22, 1892, Dull deeded this Iowa land to his wife, Nellie M. Dull. In February, 1892, Blackman began this action against Wright alone to cancel the deed he had made to Wright. Blackman then went to Chicago and wrote Dull to meet him there, with a view of settling their troubles. Dull met him, and Duffie was also present. From 1889 to 1892, Dull seems to have been advancing money to Blackman and Haldane to meet their necessities, and to aid them in prosecuting their claims. There is dispute in the testimony as to whether a settlement was in fact reached in Chicago between Dull and Blackman. That some sort of an agreement was made between them, or was consummated after they both returned to New York, seems manifest from the fact that Dull kept on advancing money to them; no doubt on the faith, also, that he would have an interest in the Hopper title generally, as the evidence strongly tends to show. Dull admits that he was to stand by Blackman in the prosecution of his suit against Wright for the recovery of the land, and claims Blackman agreed to reconvey it to him.

Blackman and Haldane fell out, and Dull undertook to reconcile their differences. Finally he determined that they were simply using him for the purpose of extorting money, and that Blackman's representations were untrue, and ascertained that he had, in the Iowa case, amended his petition; asking to have his title quieted as against Dull, as well as against Wright. Thereupon he appeared in this case, and filed an answer and cross petition. On November 3, 1892, Dull began suit in Westchester county, N. Y., to set aside his deed which he made to the Iowa land, and in said suit an injunction was issued. In this suit Blackman and his wife, Wright, Askwith, Phelan, and Duffie were all made parties defendant. Blackman, only, was served in the state of New York, Wright and Askwith were served in Council Bluffs, and Duffie and Phelan in Omaha. None of the defendants, save Blackman and wife, ever resided in the state of New York. Blackman appeared in the New York suit, and made defense. The other defendants never appeared. In this suit a final decree was entered setting aside the conveyance from Dull to Blackman, and ordering a reconveyance of the property and enjoining each of the defendants from prosecuting this action, or conveying or incumbering said land. The decree is pleaded in this action by Dull as an adjudication against all of the defendants.

Such pleadings were filed by the various parties that the following issues were presented for the determination of the trial court in the cause at bar. *First*. Alleged fraud of Blackman, practiced on Dull, in representing that he (Blackman) had eighty-six per cent. of the title of the Hopper heirs; it being claimed, in fact, that he held only fifty-four per cent. *Second*. That Blackman reported that he was a man of means, and able to prosecute the litigation in New York. It is

said that this is untrue, and that Blackman was insolvent. *Third.* That there was a failure of consideration for the deed from Dull to Blackman, and hence it should be set aside. *Fourth.* The effect of the decree pleaded. The district court entered a decree that if the mortgagee, Holcomb, elected to foreclose, he should first exhaust the lands embraced in his mortgage, which are not in controversy in this action; that the deeds from Blackman to Wright and from Dull to his wife be set aside and canceled; that the mortgage made by Wright to Askwith be canceled; that the title to the lands be quieted in the intervener Phelan, as against the plaintiff and all defendants and other interveners; and that Phelan be decreed to be the absolute owner of the land, subject only to the right of Holcomb to satisfy his mortgage out of said land, after first exhausting the other lands covered thereby, and also subject to the mortgage held by Duffie, and the claim for one thousand dollars held by Savage. The defendants Dull alone excepted and appeal.

II. As Dull and wife only appeal, we are concerned only with the question as to whether such fraud was practiced upon Dull by Blackman as to warrant the setting aside of the conveyance of the Iowa lands by the former to Blackman, and, if so, whether the other claimants to this land took their title with notice of the fraud, or with knowledge of such facts as should be held to put them upon inquiry touching it. Passing for the present the consideration of the effect of the New York judgment, what evidence is there of fraud? The first item of fraud charged by Dull is that Blackman represented to him that he owned eighty-six per cent. of the Hopper title, when in fact he only had fifty-four per cent. Blackman denies making any such representations. Haldane testifies that Blackman only had fifty-four per cent. of the title. Dull's claim in this respect cannot be said

to be established, unless we may consider Haldane's evidence. Now, Haldane's knowledge as to Blackman's title was derived only from Blackman himself, or from papers which Blackman had placed in Haldane's possession. At this time Haldane was Blackman's attorney. The information which Haldane had touching this matter was obtained confidentially, and in his professional capacity, to enable him to properly perform his professional duties on behalf of his client. Haldane's evidence cannot, therefore, be considered. Code, section 3643. Dull also testifies that Blackman represented that he was a man of means, and had land in Nebraska. So far as we can discover from the record, there is no evidence whatever that Blackman did not have the Nebraska land, nor is there any evidence that he was not a man of means, unless it be implied from the fact that he was often borrowing money. The mere fact that Blackman borrowed money shortly after this deal with Dull is no evidence of insolvency. Were it otherwise, it would not be a difficult matter to establish the fact that one-half of the men in every community were insolvent because they were borrowers of money. We conclude, then, that the alleged fraud has not been established by a preponderance of the evidence, unless the decree of the New York court is conclusive upon that question.

III. The decree of the supreme court of New York is pleaded as a complete adjudication of the rights of the parties in this controversy, and as a bar to the prosecution of this suit. Now, if it in fact be such, then it is clear that the decree in the court below in this case should have been in favor of the Dulls. Before entering into a discussion as to the legal effect of this New York decree, it will be well to ascertain just what the court undertook to do by it: *First.*

It ordered Blackman to execute a deed to Dull convey-
ing the Iowa lands; and *second,* it enjoined all of the
defendants in that proceeding from prosecuting this
action in Pottawattamie county, Iowa, affecting the
title of said lands; and *third,* it enjoined said defend-
ants from conveying or incumbering said lands. It
would appear that this decree is one in *personam,* and
not *in rem.* It does not purport to act upon the subject-
matter of this suit,—the land. True, it directs a con-
veyance of the land by Blackman to Dull, but it
nowhere provides for the making of any such convey-
ance in the event Blackman shall refuse to do so; and
we think it cannot be held to settle the title to said
land, as between the parties now contesting the same.
Another thing of interest about this decree is the fact
that by it relief is undertaken to be granted to Dull
long after the pleadings and evidence in the case show
that he had parted with all his interest in the land.
Nor was his grantee, the real party in interest, substi-
tuted in said suit. The New York suit was instituted
by Dull on November 3, 1892. The decree therein was
entered in May, 1893. Now, Dull had conveyed the
land to his wife many months before this suit was insti-
tuted. He did not have the legal title when he began
the suit, or when the decree was entered. How a decree
entered under such circumstances in favor of Dull could
confirm the title in him to land, the title to which was,
by his voluntary and unimpeached act, placed in
another person, is difficult to understand. It is con-
tended, however, that Dull, having executed to his wife
a deed with covenants of warranty, might properly
prosecute an action to reinvest himself with the title
to the land. We do not find it necessary to determine
that question.

IV. Now, it will be remembered that neither
Phelan, Wright, Askwith, Savage, nor Duffie resided
within the state of New York, neither of them was

served in that state, and neither of them appeared in
that action.   Before Dull began that action, Blackman,
his grantee, had deeded this Iowa land first to Wright,
and afterwards to Phelan.   So that when the New
York suit was instituted, as well as when the decree
therein was entered, the legal title to the land was
either in Dull's wife, or in Phelan or Wright.   The
grantees of Blackman, as we have seen, were at no
time within the jurisdiction of the New York court.
The land was not within its jurisdiction.   The only
defendant within its jurisdiction had deeded the land
to parties in Iowa, thereby divesting himself of all
interest in it.   Dull then by his New York decree, got
nothing,—obtained no rights,—at least as against any
one save Blackman.   The latter's grantees, having
acquired title long before the New York suit was insti-
tuted, could not be affected by the decree thus ren-
dered therein.   Under our law, in such a case, to affect
the title to this land, even if suit had been instituted
in this state, it would have been necessary to have
made Blackman's grantees parties defendant.   They
were made parties defendant, but were not within the
jurisdiction of the New York court, and are therefore
wholly unaffected by its decree.   *Swan v. Clark*, 36
Iowa, 560.   Now, counsel for appellant argue with
great zeal that the New York decree was binding as
between Dull and Blackman, and place stress upon the
cases of *Massie v. Watts*, 6 Cranch, 148; *Burnley v.
Stevenson*, 24 Ohio St. 474; *Mills v. Duryee*, 7 Cranch,
481; *Hampton v. McConnel*, 3 Wheat. 234; *Gilliland
v. Inabnit*, 92 Iowa, 46 (60 N. W. Rep. 211).   Now, a
consideration of some of these cases will serve to show
that they are not applicable to the case at bar.   The
leading case, which all others follow, is the *Massie
Case*.   That was an action to compel Massie to convey
to Watts lands located in the former's name, but
within a location made under a land warrant owned by

O'Neal and assigned to Watts, and which was placed in Massie's hands, as a common locator of lands. These lands lay in Ohio, and the action was brought in the state of Kentucky, where the parties resided. Clearly, here was a case of trust created, and the court decreed that Massie, in whom the title vested, should convey to Watts. The decree, of itself, did not act upon the land. It simply provided for the doing an act by the party, which, when done, would operate to transfer the title. If Massie refused to obey the decree, he might be punished for contempt, but the title would remain as before. In the Kentucky case it was held that the action was not *in rem*, but in *personam*, for the purpose of enforcing a personal obligation of contract or trust. And so it is said in *Hart v. Sansom*, 110 U. S. 155 (3 Sup. Ct. 586), "It is clearly not a judgment *in rem*, establishing a title in the land, but operates in *personam* only;" and in the same case, in speaking of the equity power of the court, it is said, "It has no inherent power, by the mere force of its decree, to annul a deed or to establish a title." See *MacGregor v. MacGregor*, 9 Iowa, 65. Without further discussing this phase of the question, we conclude that this New York judgment is not binding upon these parties who were not within its jurisdiction, so as to affect the title to land in this state, and we need not determine as to whether that judgment was effective as against Blackman. Much more might be said in this connection, and a multitude of authorities cited, but it is not necessary so to do.

V. We have said that fraud on the part of Blackman has not been so established as to warrant a court in setting aside the conveyance made by Dull to Blackman. That conclusion is decisive of the case, and we might rest our judgment upon it alone. There are, however, reasons which show that, even if fraud had been established, still Dull is not in a situation to take

advantage of it.   It may be profitable to briefly con-sider some of them.   It is elementary doctrine that one who would rescind a contract on the ground of fraud should act promptly.   Now, what did Dull do?   He confesses that in October, 1889, or shortly thereafter, he knew that Blackman had quitclaimed to Dull's landlord the very tract of land on Broadway which he had previously sold to Dull. Did he then take such steps as a man ordinarily would who had discovered that a gross fraud had been prac-ticed upon him?   He proceeded to advance money to Blackman and Haldane to aid them in prosecuting their claims.   He goes to Haldane to get the deed which was deposited in escrow, and which King had turned over to Haldane, and which the latter had destroyed.   He procures Haldane to make an affidavit as to its loss.   At the interview in Chicago he asks Duffie touching his situation with reference to his claim against this New York property, and is told that, as his landlord holds by a quitclaim deed, he (Duffie) thinks his mortgage and his claim is a better claim than that of his landlord.   Dull appears to have acted upon this advice to the extent of putting himself in a position to prove the execution of the deed.   He evi-dently then had no thought of setting aside his deed to Blackman for the Iowa land.   He admits that, about two weeks after he left Chicago, he and Blackman "came to some sort of an understanding" touching Blackman's proposition to give Dull an interest in the New York enterprise.   And, though he claims no set-tlement was made between him and Blackman, he admits he advanced the latter about three thousand dollars thereafter.   Dull's whole course of conduct after his discovery of the alleged fraud, and which is evidenced by many acts of his, was only consistent with the theory that he expected to have an interest with Blackman in the New York enterprise, and to

prosecute his claim against his landlord for his interest in the title to the Broadway property which he (Dull) occupied as a tenant. If such was not his intent, then he was speculating as to whether he could thus realize the most for himself, or whether he might in the end, if it seemed more desirable, resort for relief to his action to set aside his deed to Blackman. Such a course is not consistent with the duty of one who claims to have been defrauded,—to promptly act in the premises. He cannot be thus permitted to play fast and loose. His own conduct is inconsistent with his present claim. After sleeping upon his rights, if he had any, for over three years, he is in no situation to complain if relief is not granted to him.

VI. Very many other matters are discussed by counsel, such as the effect upon Dull of his failing to record his mortgage on the New York property; whether Phelan was a good-faith purchaser of the Iowa land; whether Savage and Duffie are in a situation to be protected as was done by the court below. Now, the length of this opinion precludes the separate discussion of these and many other questions raised by the counsel. We have examined all of them, and we are fully satisfied, in every particular, with the decree rendered by the district court. The conclusion we reach is that, whatever may be the real merits of Dull's claim, he has failed to establish it by the evidence; that his conduct, even if he had established his claim, has been one of acquiescence in the alleged fraud, and utterly inconsistent with the thought that he expected to exercise a right to rescind his contract of conveyance; and that Phelan, Savage, and Duffie have acquired interests in the Iowa land which, under the circumstances, should be protected. Appellees' motion to strike the denial of their abstract is over-

ruled. The decree, therefore, of the district court, is in all respects *affirmed*.

Deemer, J., having tried this case below, takes no part in its consideration in this court.