J. M. JOSEPH, Appellant, v. W. J. DAVENPORT and CRES
· TON MINING COMPANY.

**Mining Shares in Voluntary Association:** SALE FOR NON-PAYMENT OF ASSESSMENT. A trustee took a mining lease with option to purchase, and providing· that certain work should be done monthly, failure to do which for ten days should forfeit the lease. He formed a voluntary association, issuing to each member a certificate representing a 1-30 interest, and providing that the holder should pay $10 on the fourth of each month, and ·on failure to pay assessments the share might be sold, etc. Afterwards, at a meeting ·of all the shareholders, they agreed that the monthly expenses should be divided into thirty parts, each part to constitute an assessment, and thereafter . the assessments were doubled. Plaintiff purchased a share of the original holder, and on default, his share, with

other delinquents was sold. *Held*, that, even if the organization was a partnership, and not a joint stock association, the sale of plaintiff's delinquent share was as valid as plaintiff's purchase thereof.

CONSTRUCTION OF SALE CLAUSE. In view of the necessity of prompt payments to comply with the terms of the lease, and the manifest intent of the parties, the provision in the certificates that the sale of delinquent shares should "take place on the tenth day of the month following such failure," etc., should be construed to mean the tenth day of the same month after the default in payment of assessments.

LACHES OF PERSON WHOSE SHARE WAS SOLD. The purchaser of plaintiff's delinquent share, after having paid $46.90 in assessments, offered to return it to plaintiff without charge if plaintiff would keep up future assessments. Plaintiff refused and thereupon the purchaser assigned to defendant on the same terms who paid two assessments. Eighteen months after the mine became profitable plaintiff sued to recover the share. *Held*, that he was estopped by his laches from claiming the property, or objecting to irregularities, if any, in the sale of his share as delinquent.

*Appeal from Union District Court.*—HON. H. M. TOWNER, Judge.

THURSDAY, APRIL 10, 1902.

ACTION in equity for an accounting and to recover the profits on an interest in a gold mining company, which interest plaintiff claims he owns and holds, and which defendants insist he forfeited by failing to pay certain assessments levied thereon. From a judgment dismissing the petition and taxing costs to plaintiff, he appeals.—*Affirmed.*

*Jas. G. Bull* and *Temple, Hardinger & Temple* for appellant.

*Spurrier & Maxwell, D. W. Higbee,* and *Sullivan & Sullivan* for appellees.

WATERMAN, J.—On July 30, 1897, one George W. Bilbo, as trustee, took a lease, containing an option to pur-

chase, of a certain mining claim in the state of Colorado,. from the Jack Pot Mining Company, its then owner. This lease provided that the lessee should perform a certain amount of work, viz, sinking at least 15 feet. of shaft, or drifting or cross-cutting at least 20 feet, during each month of the term granted, and that a failure to work the premises for a period of 10 consecutive days should forfeit the rights of the lessee. We are not concerned with any of the other provisions of the instrument. Those we have given are material only as showing the necessity for prompt payment of assessments for carrying on the work. After procuring this lease, Bilbo formed a voluntary association of individuals, who were styled *cestuis que trustent,* and entered into a trust agreement, as it is. styled in the instrument, but which, inasmuch as it is signed only by Bilbo, trustee, may, with more accuracy, be denominated a declaration of trust. The *cestuis que trustent* are mentioned as signing the agreement as party of the first part, and are described as owners of certain certificates or shares issued by Bilbo as trustee, each of which represents a one-thirtieth interest in the leased property. It was provided the certificate holders should pay the sum of $10 on each share on the 4th day of each month. The trustee was directed to give notice by letter on the 25th of each month to every certificate holder, of such assessments. It was also stipulated that said payments were for the purpose of developing the mine, and to meet other necessary expenses. In case of a failure to pay the assessment on any certificate, it was provided that such share may be sold "on the 10th day of the month following such failure"; sale to be made by the trustee for the highest and best price he could obtain on said day. A further provision made the certificate assignable, if assessments were not in default. With this agreement as a basis, Bilbo formed the association of persons mentioned, at and about Creston in this state, to whom certificates were executed. Originally there

were 36 certificate holders, but the number was afterwards reduced to 30. Each certificate provided that the holder was entitled to an undivided one-thirtieth interest in the leased property, and was entitled to receive any profit or advantage "that may come into the hands of said trustee." It contained the same provision as the declaration of trust, in relation to the right of the trustee to sell the certificate for a default of the holder in paying assessments. One Stewart was originally the owner of a share. On February 15, 1898, for a consideration of $5 he sold and transferred the same to plaintiff. Some time after the organization of this association, and before plaintiff acquired his share, it became necessary to increase the assessments, and at a meeting attended by all the shareholders, including Stewart, plaintiff's assignor, it was unanimously agreed that the monthly expenses, whatever they might be, should thereafter be divided into 30 equal parts, and the holder of each certificate should pay one such part, as the assessment on his share. Under this arrangement the assessments increased considerably, beginning with the month of September, 1897. For the month of February, 1898, the assessment was $25; March $20; April, $20; May, $20, and June, $26. The most strenuous efforts were required from time to time, by the trustee, to secure payment of the assessments due and perform the required work on the property, necessary to prevent a forfeiture of the lease.[*] Certificate holders lost heart and ceased to pay. About the beginning of the year 1898, the prospect was unusually gloomy. At the end of the month of March when the pay roll of that month was reported, a number of shareholders refused to pay assessments. Early in April a telegram was received from the mine, that the men had refused to work for several days because they had not been paid for their March labor. The money was borrowed to pay them, and they were induced to go to work just in time to prevent a forfeiture of the lease. Plaintiff refused to pay

his March assessment, he says not unconditionally; nevertheless, he admits the money was not forthcoming on demand. On the 11th day of April, the 10th falling on Sunday, plaintiff's share, with four others which were delinquent, were sold. There was no public bidding, for the shares had no value, but at a meeting called for the purpose of disposing of them, it was sought to find some person who would take them paying the assessment in arrear and assuming those to be thereafter levied. The five shares delinquent were finally so disposed of, Bilbo taking plaintiff's share. Bilbo then paid the March assessment, $20, and paid a proportionate share of other bills due, amounting to $6.90. He paid the April assessment of $20, and thereafter offered to return the share to plaintiff without charge, if the latter would keep up future assessments. Plaintiff refused. Bilbo, after this, induced defendant Davenport to take the share and pay subsequent assessments, and that is how the latter becomes personally a defendant herein. Other assessments for May and June were paid by Bilbo or Davenport. In the latter part of June, 1898, the mine developed into a producing property. The company was incorporated as the Creston Gold Mining Company. Up to the time of trial in the court below something over $12,000 in dividends had been paid on each share. This action was begun in October, 1899.

I. Plaintiff asserts that the first organization of which he was a member was a co-partnership. *Perhaps it was, for it has many of the incidents of a joint stock company, though it differs in one particular from any such companies to which our attention has been called,—in that title to its property or assets was vested in a trustee. But the matter is of no consequence. Whatever the character of the original association, authority was given the trustee to sell the shares for non-payment of assessments, and the exercise of this power was as valid as was that of assigning shares, and it was by or through such an assignment, as we have already seen, that plaintiff acquired his certificate.

II. Certain objections are made to the methods pursued in accomplishing the forfeiture. It is said no written notice was given plaintiff of the assessment; the assessment was for more than $10; there was no notice of the sale given plaintiff, nor advertisement thereof, nor appraisement of the property. Some other matters are suggested, but not argued; so we shall not notice them. As to the increase in assessment, this was agreed to by all parties before Joseph became a member. That he knew of it when he took his certificate is shown by the fact that he paid the February assessment of $25, and made no objection to the assessment for March on the score of amount. Furthermore, he has never offered to pay even the amount of the assessments which he now admits were legal. With relation to the other matters, it may be said plaintiff knew of the amount of the March assessment and admits that demand was made upon him therefor. It also appears that he was verbally notified of the date of the forfeiture sale. While nothing is said in the articles about the manner of sale, its purpose and object, together with the date fixed for it, indicate that it was to be without the formality of appraisement, and without the delay of advertisement provided for in sales on execution. The sale was to "take place on the 10th day of the month following such failure," etc. This language is clear when the purpose is considered. Ten days' delay in the work on the property would forfeit the lease; prompt payments by certificate holders were necessary in order to continue the work, for that was the only source of revenue. To delay the sale of a certificate upon which an assessment was delinquent for a month would result almost inevitably in the loss of the property. Therefore, this clause is to be construed as the 10th day of the same month after such failure, and not the 10th day of the following month. But if the sale was prematurely made, and if there were irregularities in making an assess-

ment and sale, of which plaintiff might have been heard in
timely complaint, we think he has lost such rights by his
laches.  Plaintiff knew of the March assessment, and de-
clined to pay it.  He knew of the date of the sale of his stock.
After the sale, he refused to receive the certificate and as-
sume future obligations, when a return of it was offered.  At
that time the certificate represented only an obligation of
indebtedness, and he did not care for it.  He knowingly per-
mitted the purchaser to go on paying assessments to save the
lease, and only when it became manifest the certificate was
of value, some 18 months after forfeiture, did he make claim
to its ownership.  Even now he does not tender the amount
of the assessments paid on his stock.  There seems no equity
in his favor.  Laches is an equitable estoppel.  *Evans v.
Montgomery,* 50 Iowa, 327.  The doctrine is enforced in all
cases where there has been an omission to assert a right in
conjunction with lapse of time causing prejudice to an ad-
verse party.  *Blackman v. Wright,* 96 Iowa 541; *Horr v.
French,* 99 Iowa, 73; *Bacon v. Chase,* 83 Iowa, 521.  These
cases are cited only as announcing the general nature of this
equitable doctrine.  The rule may be narrowed for the pur-
pose of the present case, into the statement:  Equity will
not relieve against a forfeiture of stock, where the share-
holder has acquiesced in the same until a change of circum-
stances or conditions has arisen.  Thompson, Corporation,
section 1807; 2 Pomeroy, Equity Jurisprudence 965.  In
*Sayre v. Heat Co.,* Cal. (7 Pac. Rep. 437), certain shares of
stock belonging to plaintiff's assignor were sold for non-pay-
ment of assessments and bought in by the corporation.  Af-
terwards they were tendered back on condition that the as-
sessment should be paid.  The owner refused to receive
them.  At this time the stock was worth but little.  Subse-
quently it became profitable, and action was brought to re-
cover the shares.  Plaintiff was denied relief because of his
acquiescence in the sale.  *Hayward v. Bank,* 96 U. S. 611
(24 L. Ed. 855) is even a stronger case, or perhaps we should

say, states a phase of the rule more pertinent to the case at bar. In that case mining stocks had been deposited as collateral, and were sold by the pledgee. Plaintiff was informed of the sale, and did not object. The stocks thereafter increased in value, and action was brought to redeem. Held, that delay in bringing suit—about 3½ years—barred his rights, the court saying; "Without reference to any statute of limitation, equity has adopted the principle that the delay which will defeat a recovery must depend upon the particular circumstances of each case. The question of acquiescence or delay may often be controlled by the nature of the property which is the subject of litigation. A delay which might have been of no consequence in an ordinary case may be amply sufficient to bar relief when the property is of a speculative character, or is subject to contingencies, or where the rights and liabilities of others have been in the meantime varied. If the property is of a speculative or precarious nature, it is the duty of a man complaining of fraud to put forward his complaint at the earliest possible time. He cannot be allowed to remain passive, prepared to affirm the transaction, if the concern should prosper, or to repudiate it if that should prove to his advantage." See also, to substantially the same effect, *Twin Lick Oil Co. v. Marbury*, 91 U. S. 587 (23 L. Ed. 328).

The trial court made a proper disposition of the case, and its judgment is AFFIRMED.