B. TAPPER, Appellee, v. WASHINGTON REFINING COMPANY et al., Appellants.

**FRAUD: Burden of Proof—Presumption.**   Principle reaffirmed that he who alleges fraud must prove the fraud alleged.   Evidence relative to the purchase of corporate stock reviewed, and held wholly insufficient to establish fraud.

**SALES: Rescission—Belated Rescission.**   A rescission of a contract of purchase of corporate stock, on the grounds of fraudulent representations as to the financial condition of the corporation, will not be permitted when the purchaser delayed his attempted rescission for more than a year after acquiring full knowledge of such condition.

**FRAUD:** Pleadings Control. He who alleges distinct acts of fraud
3   may not recover on other and different acts of fraud, even though
such other acts would be evidentiary side lights, were he success-
ful in proving the acts alleged.

*Appeal from Linn District Court.*—Milo P. Smith, Judge.

MARCH 10, 1921.

REHEARING DENIED OCTOBER 1, 1921.

EACH of the two above-entitled cases was brought in equity,
to rescind the sale to plaintiff of 10 shares of the capital stock
of the Washington Refining Company, and to recover from de-
fendants the price paid therefor, as well as for the recovery of
an amount alleged to have been paid by the plaintiff, B. Tapper,
as indorser upon the promissory notes of said corporation. The
two cases were tried together on the same record. There was a
decree for plaintiff in each case, substantially as prayed, and an
appeal therefrom by the defendants. The appeals are submitted
together upon the same record.—*Reversed.*

*Redmond & Stewart*, for appellants.

*Deacon, Good, Sargent & Spangler, B. L. Wick*, and *L. M.
Kratz*, for appellees.

WEAVER, J.—Though the appeals in the two cases are sub-
mitted for decision upon the same record, we shall, in this opin-
ion, where not otherwise noted, use the word "plaintiff" with
special reference to B. Tapper, first named, who
had a leading part in the transaction out of
which the litigation has arisen. The word "de-
fendants," where used, has special reference to the individual
defendants, Doerfler, Achter, James, and Brewer. The substance
of plaintiff's claim is that, by the false representations of the
defendants, he was induced to subscribe for certain shares of
capital stock in a corporation known as the Washington Refin-
ing Company, and to pay therefor their full par value, when
such shares were, in truth, of no value whatever, and the money
so invested has been wholly lost. The defendants deny all

1. FRAUD:
burden of
proof: pre-
sumption.

charges of wrong and fraud on their part.   More specific statement of the issues of fact will appear in the course of this opinion, so far as they are necessary to a determination of the merits of the case.

The printed record is very voluminous, and not always as clear as might be desired; but the general nature and effect of the various charges and countercharges are not difficult of comprehension.  When reduced to lowest terms, the ultimate issue between the parties is purely one of veracity; for, with that question settled, there is no material difference between counsel as to the applicable principles of law and equity.   Though the dispute of facts is, in some respects, very radical and irreconcilable, there are yet many circumstances of evidentiary value on which there is practical agreement.   A brief recital of some of these is quite essential to a fair understanding of the case.

Prior to the year 1916, Martin Olson and C. E. Speer conducted an oil business in Cedar Rapids under the firm name and style of ''The Washington Refining Company.''   Olson was a man of means, and supplied the principal capital or credit for the business, while Speer was a person of experience in that business, and had the practical management of the firm's affairs. How long this enterprise had been in existence does not appear; but it seems to be conceded that it had not prospered, and Olson desired to wind it up or close it out in some manner.   Speer had insufficient capital to carry it on alone, and conceived the plan of organizing a corporation to take over the name and the business, and by thus giving it new life and new credit, avoid sacrifice.   In the course of this endeavor, Speer got into negotiation with the defendants, each of whom had an independent business of his own, and each, we may assume, of reputable business standing.   Of these men, Doerfler and Achter appear to have been the first to entertain the idea so presented by Speer; but ultimately, all the defendants were associated in the project. Just when the negotiations between Olson, Speer, and the defendants culminated in agreement, is not definitely shown; but it is evident that at least a tentative understanding was arrived at, about the first of the year 1916; for the corporation was organized in January of that year, with an authorized capital of $30,000.

The substance of the agreement was that the Olson and Speer interests, .with all the property and property rights, including the business and good will, were to be taken over by the corporation at a valuation of $13,000, of which amount Olson was to receive $7,000 in shares of preferred stock in the corporation, which preferred stock was to be retired at the rate of $1,000 per year, and Speer was to receive $6,000 in shares of the common stock. The plan, at the outset, contemplated the retention of Speer in the business as manager. It was also agreed between Speer and defendants that, in consideration of their influence and financial aid in organizing and starting the corporation, he would turn over to each of them 10 shares, out of the common stock allotted to him for his interest in the former partnership with Olson.

Before this was fully consummated, it was discovered that some of the alleged assets of the old partnership listed to the corporation by Speer were overestimated or nonexistent; and, upon being called to make correction, Speer turned back into the corporate.treasury the remaining shares left in his hands, and dropped out of the deal. As a matter of fact, Olson & Speer, instead of transferring the old stock and business direct to the corporation, made the transfer to Achter, who, in turn, transferred it to the corporation, the named consideration in each case being $13,000. Upon the making of the transfer by Achter, the corporation issued to him its check for $12,000, which he deposited to his own account. At about the same time, the defendants severally subscribed for 10 shares of the common stock, and each made his check for a like amount, and another check for $7,000 was made, marked "Olson preferred stock:" all of which were paid out of the deposit which Achter had made, of the check for $12,000 issued to him by the corporation, thus "squaring the circle," and leaving the brand new treasury empty. At or near this time, it seems to have occurred to some of these gentlemen that, if they were to gather wealth from the sale of oil, it might be wise to have oil to sell; and, the corporation having neither the ready cash nor credit for its purchase, they united in indorsing the corporate promissory note for $1,000, and thus raised the money with which to pay for a car-load. Up to this time, plaintiff had not appeared on the scene,

or at least had not yet become a stockholder; and whatever may be thought of the transactions we have already detailed, there is nothing in them which constitutes a fraud upon him for which he can recover in this action, which is based solely upon alleged false and fraudulent representations made to him.

The resuscitation of a moribund, privately owned business enterprise, by incorporating it and by transfusion of new blood into its veins, is a device which is neither unknown nor unlawful, and it sometimes proves successful. In attempting to apply that heroic remedy in this instance, defendants were, therefore, well within the scope of legitimate business, but were not, of course, licensed to disregard the ordinary obligations of fair dealing and good faith; and if, in carrying out the project, they violated the law or trespassed upon the rights of others, they became liable to answer therefor in a proper action, at the suit of any person suffering injury therefrom. If, then, the defendants availed themselves of the opportunity afforded by this incorporation of the Washington Refining Company, to obtain for themselves shares of its capital stock without payment therefor, they exposed themselves to liability to corporate creditors to the extent of their subscriptions, and perhaps to other liabilities; but proof of such fact and no more would not make a case for recovery in this action, which is predicated alone on the charge of specific false and fraudulent representations made by the defendants to plaintiff; and it is not enough to show, if such be the fact, that defendants paid nothing for their own stock, or that the Olson & Speer assets were taken over at an excessive valuation.

The ultimate question in this case is whether the defendants did make false and fraudulent representations to the plaintiff, and thereby induce him to take stock in the corporation. It is here that we enter the region of irreconcilable conflict of evidence. Reduced to fewer words, plaintiff's petition states the two particular charges relied upon: (1) That defendants falsely represented to him that the Olson & Speer assets were of the value of more than $7,000, when, in truth and in fact, they were worth much less than that sum; and (2) that defendants further falsely represented that they had each subscribed and paid $1,000 for 10 shares of stock, and that the money so paid was

then in the corporate treasury, for use as working capital in the corporate business.

I. We give first attention to the charge that defendants misrepresented to plaintiff the value of the Olson & Speer assets, taken over by the corporation. As a witness, plaintiff testifies that, in subscribing and paying for his stock, he relied on the statements made to him ''by Mr. Doerfler with reference to the company, its organization, capital, and assets which the company had;'' but we search the record of his testimony in vain to find where he testifies to any specific representation to him by Doerfler or anyone else on that subject before he paid for his shares. The record is quite voluminous, with numerous abstracts and amendments, and we may have overlooked some part of it; but we think not. We do find that Doerfler, in his own testimony, says that, in conversation with plaintiff, he told him that they had taken over the Olson & Speer assets at $13,000; and that, after such talk, plaintiff, with the witness, Achter, and James, went out and looked the plant over. So far as appears, this is the only talk in which the matter of the Olson & Speer assets was ever mentioned between the parties, before the stock was subscribed for. Again, it does not satisfactorily appear that $13,000 (or $12,000, as seems to have been the basis of valuation upon which the transfer was finally effected) was such an exaggerated valuation as to necessitate the conclusion of fraud. Doubtless, if sold as the remnants of a closed business, and for cash, these things would have been worth very materially less; but, in view of the fact that the partnership of Olson & Speer was still a going concern, and still had some goods on hand, with automobiles, tanks, drums, trucks, and other miscellaneous matters,—all of which, together with book accounts, business, and good will, were included in the transfer,—and in view of the fact that the entire sum was paid in stock of the corporation, which still had to prove its ability to live, we think it cannot be said that the consideration was grossly exaggerated. In the absence of any showing of false representation in this respect, it must be said that a finding that plaintiff was in any manner deceived or misled by false representations on the part of the defendants as to the value of the assets turned over to the corporation or to defendants by Olson & Speer, cannot be sustained.

II.  We now come to the charge made in the petition that defendants falsely represented to plaintiff that they had each paid $1,000 for their shares of stock, and that the money therefor was then in the treasury, for use as a working capital.  That is the only serious question which is open to our consideration, under the issues joined, and for two sufficient reasons we are satisfied that plaintiff can have no recovery thereon.  The representations so alleged, if made, were grossly false, and must have been employed with deliberate intent to deceive and defraud the plaintiff.  The charge is specifically denied, and upon this issue the burden of proof is upon the plaintiff.  Fraud will not be presumed.  It must be proved.  In the petition, the accusation of misrepresentation and fraud is made with equal emphasis against each and all of the four defendants, Doerfler, Achter, James, and Brewer; but when, as a witness, plaintiff was asked on what he relied, in taking and paying for his stock, he replied, "I relied on the statements made to me by *Mr. Doerfler* with reference to the company, its organization, capital, and assets,"—no mention whatever being made as to anything alleged to have been said to him by any other defendant.  It is also worth noting at this point that, a year and a half after the alleged fraud, when preparing to bring this action, plaintiff, by his counsel, addressed a joint letter to Doerfler, James, and Achter, notifying them of his discovery that they had perpetrated a fraud upon him and upon his son, and specifying the wrong of which he complains, as follows:

"You procured contracts for the purchase of the assets from Mr. Speer and Mr. Olson, said contracts being in the name of Mr. Achter.  The business, at the time of making these contracts in the name of Mr. Achter, was several thousand dollars worse off than nothing; and yet you pretended to buy these assets from Mr. Achter for $12,000 in cash, and issued a check of the company to Mr. Achter for that amount.  You borrowed money to protect the check when it was presented at the bank, and then the transaction was handled in such a way that the $12,000 that was paid to Mr. Achter was distributed in such manner that the corporation received no benefit from the money paid in on your subscriptions.  The only money that ever went into the business of the company from stock issued, was the money that was re-

ceived from the sale of the stock to E. B. Tapper and myself. To aid in the manipulation, a false statement of assets was placed upon the books of the company. My son, E. B. Tapper, has authorized me to act for him.''

In this formal statement and demand, no mention is made of Brewer. On the same date, however, a copy of the letter to the other three defendants was inclosed in a separate envelope, addressed to Brewer, and all the letters were delivered by registered mail. The envelope addressed to Brewer contained no charge against him and no demand upon him. Its purpose is not revealed to the court; but we may, perhaps, infer that it was intended to furnish Mr. Brewer with a news item for the columns of the paper of which he is said to be publisher. Its chief value as evidence at this point is in the fact that, in this formal statement of his complaint against the defendants, he does not so much as mention the alleged false representation that the money for defendants' shares had been paid, and was in the treasury. Nor does he there mention the name of Brewer in that connection.

The plaintiff, in his own testimony, does swear positively and clearly that Doerfler did make the alleged statement that the stock held by the defendants had been paid for, and that the money was in the treasury for corporate use; and that he believed and relied upon that representation, in making his own subscription. No corroboration of this testimony is offered by any witness who claims to have been present at such conversation. Nor does he claim to have been so told by any other defendant, except a statement attributed to Brewer, at another time and place, to the effect that he had confidence in the men and in the enterprise, and had put his own money into it; but he does not quote Brewer as saying that the money was in the treasury. We find no evidence of any statement or representation to plaintiff by Achter or James, of the kind charged in the petition. There is testimony by E. B. Tapper that he was told by Doerfler that the stock issued had been paid for, and that the money was in the treasury as a working capital; but the time when he says this statement was made was two weeks or more after the plaintiff, B. Tapper, had subscribed and paid for his stock, and, of

necessity, such representation, if made, could not have influenced his action in making the subscription.

Doerfler denies positively that he ever made such representation to either plaintiff or his son, but avers that plaintiff, having learned from some source that defendants were interested in an enterprise of that nature, came to him, without invitation or solicitation, saying that he would like "to get in on it," and did, without solicitation or urging, subscribe and pay for 10 shares; that plaintiff was informed, not only that the corporation had no money, but that it had borrowed $1,000, with which to make purchase of its first carload of oil; and that, before taking the shares, plaintiff had made personal examination of the plant of the corporation, and was advised of its real financial condition.

In the action brought by E. B. Tapper, the charge of fraud and false representation by which he was induced to subscribe for his stock is made in the identical language, and against the same parties. As a witness, he too was asked to state on what he relied in taking his stock, and answered:

"When I gave my check and purchased the 10 shares of stock, I relied on the statements made by Mr. Doerfler to me, with reference to the stock of the company, and the statement by Mr. Doerfler that Mr. Doerfler, Mr. Brewer, Mr. Achter, and Mr. James had put in $1,000 each for this capital stock of the company, and that the money was in the treasury of the company for working capital."

He makes no claim, in testimony, that he ever had such talk with any other defendant, or received any information or assurance of that kind from any other defendant than Doerfler. Doerfler denies the charge in every respect; denies soliciting or asking any subscription from the witness; and says that the suggestion that the witness would subscribe came first from the witness's father, the principal plaintiff himself, who said or promised that E. B. Tapper would take the shares. The issue of alleged false representations, when brought to the test of proof, is narrowed down to the inquiry whether the defendant Doerfler did tell or assure the plaintiff that the shares of stock held by the defendants in the corporation had been paid for by them, and that such fund was in the corporate treasury as a working

capital. To find for the plaintiff upon this dispute would necessitate a finding that his version of the story of the interview or talks with Doerfler is true, and that Doerfler's is false. The burden is upon plaintiff to establish his charge by a preponderance of the evidence, and we think it must be said that it is not so proven. To find for him on this question is equivalent to saying that we find that this defendant is not only guilty of the wrong so imputed to him, but has perjured himself on the witness stand; while to find that plaintiff is not entitled to recover, implies no such imputation against him, for such result is entirely consistent with the thought that the parties are of equal credibility, and that, their testimony being entirely irreconcilable, there is no preponderance of evidence, and plaintiff must fail.

III.   There is another aspect of the case which, we must hold, precludes a recovery. To repeat once more, this is an action to rescind a subscription for shares of stock, because of alleged

2. SALES: rescission: belated rescission.

false representations by defendants by which plaintiff was induced to take the shares; and, if a rescission is to be had, it must be upon the established legal rules and principles which govern the trial and decision of other cases of that nature. Among the essential propositions which plaintiff must establish, to maintain such action, is not only the fact of the alleged representations and their falsity, but that he believed and relied thereon, to his injury, and that, upon discovery of the fraud which had been practiced upon him, he acted with reasonable promptness in repudiating the contract and rescinding or offering to rescind it. He could, of course, waive his right to rescind, and maintain an action for damages; but he cannot have both remedies. *Estes v. Reynolds*, 75 Mo. 563; *Bell v. Keepers*, 39 Kan. 105; *Mattauch v. Riddell Auto Co.*, 138 Iowa 22; *German Sav. Bank v. Des Moines Nat. Bank*, 122 Iowa 737; *Joseph v. Davenport*, 116 Iowa 268.

Plaintiff subscribed and paid for his stock in March, 1916. His first demand upon defendants, charging them with fraud, was not made until July 13, 1917, a year and four months later. Recognizing the unfavorable inference which might arise from this delay without explanation, it is alleged in the petition that plaintiff did not discover the falsity of the representations until

very shortly before bringing this suit. If the truth of that allegation is not established by the proof, then it must be said, as a matter of law, that the election to rescind was not made within a reasonable time. *German Sav. Bank v. Des Moines Nat. Bank,* supra. To meet this need, plaintiff swears, "I first realized they had no money in the spring of 1917," at which time he says his son Edgar looked over the books, and told him that there was something wrong about the early entries there. This, he says, was in April or May. He denies that he took any active hand in the business of the corporation during the nearly year and a half of its business life, or ever knew that he was made a director and vice president of the concern, until he learned of it in some way in the spring of 1917; and says that, in April of that year, he sent his written resignation to Achter, the secretary.

He further swears that at no time in 1916 or 1917 did he act as director of the company or perform any duty as its manager or have any knowledge of its financial condition, until his attention was called to it by his son, who had begun to investigate the books. On this feature of the case, the weight of the evidence is clearly against the plaintiff. While the secretary of the corporation seems to have kept no formal book or record of entries of its transactions, he produces memoranda or notes of the business done. He also testifies, as a witness, as do all the defendants, concerning plaintiff's connection with it; and it appears with reasonable certainty that, at the first meeting after plaintiff became a stockholder, he was elected to the board of directors, and made vice president of the corporation, and that he was present at the time, and thereafter regularly met and acted with the board, as a director. Mr. Brewer, at whose office this first meeting was held, testified to such fact, and says:

"I know of no time when he refused to act in that capacity. He attended meetings, whether they were formal or informal, from that time on. He took part in the meetings, and voted as a director. He took quite an active part always."

Mr. Achter, who was present at the meeting in Brewer's office, says that plaintiff was there elected a director. Mr. James, who says he was present at the election, corroborates the testimony of Brewer and Achter that plaintiff was not only made a director but attended their subsequent meetings, formal and in-

formal, and acted and voted as a director. Doerfler tells the same story, and says:

"In the year 1916, he [plaintiff] attended every meeting we had, as director. I imagine we had meetings about once a month."

The defendants unite, also, in saying that plaintiff had knowledge from the first that there was no money in the treasury, and that they had borrowed $1,000 to make their first purchase of oil. Plaintiff denies this, but admits that, when the note given for that loan fell due, he joined with the defendants in signing a renewal of it, and further admits that, to meet the needs of the corporation as they arose, from time to time, he united with defendants in indorsing other notes for its use, some four in number, aggregating $2,750. According to Achter's memoranda, plaintiff attended a directors' meeting as late as September 29, 1916, at which he moved that $10,000 of the common stock be sold, and also moved that the proper officers be authorized to negotiate a loan of $1,000, both of which motions were carried. Again, on October 30, 1916, at another meeting, he offered and had adopted a carefully prepared set of resolutions regulating the manner of keeping the treasurer's accounts, as well as the books of the manager. In the course of the same meeting, he is represented as taking active part in disposing of the business before the board, and, with his son Raymond, was named "to look after the purchase of all merchandise."

Under an April, 1917, date, after having acted in that capacity for over a year, plaintiff sent to the secretary, Achter, a written notice, saying, "On account of other business, I hereby tender my resignation as vice president and director of the Washington Refining Company, the same to take effect April 15, 1916,"—of which writing he preserved a copy, indorsed, "Mailed to Henry Achter, secretary of the company, April 16, 1917."

If we yield to plaintiff the benefit of the doubt whether he knew of the loan of $1,000 negotiated by defendants about the time he subscribed for his stock, it is still quite incredible that he should go on for more than a year, knowing, as he must have known, the corporation's chronic need, uniting with the defendants in pledging his personal credit over and over again, at-

tending its business meetings, taking an active part in its delib-
erations, voting authority to the officers to negotiate loans, and
authorizing the sale of large installments of the capital stock,
without asking a question as to the $4,000 or $5,000 of "work-
ing capital" which he now says he believed was in the treasury
when he came into the concern. He is apparently a man of large
business experience, has long been president and manager of
another corporation, doing an extensive business, and, if we
may judge from the record before us, is accustomed to act with
energy and efficiency; and we cannot believe that he was led
blindfolded through this year and more of strained and vain
effort to build up a self-supporting business, without acquiring
a very complete knowledge of its true inwardness. It seems to
us quite clear that, during all this time, he, with his associates,
was making a strenuous endeavor to tide the enterprise over the
troubles which beset it, and that not until that endeavor appeared
hopeless did he conclude that he had suffered a wrong which only
the courts could remedy. A demand for rescission under such
circumstances cannot be entertained. Whether other remedy ex-
ists, is not for us here to consider or decide.

Stated in brief, there is no sufficient showing to support
the charge of false representations to the plaintiff as to the
value of the assets of the corporation, or false representations
as to the presence of working capital in the treasury; and for
that reason, the petition must be dismissed.

IV. We think it must be said that, somewhere in the prog-
ress of this case, after its nature had been developed by the plead-
ings, petitions, and answers, the plaintiff has
lost sight of its essential character. In sum-
ming up the propositions on which appellee re-
lies to affirm the decree below, counsel enumerate the following:

3. FRAUD:
  pleadings
  control.

"(1)  The sale of 10 shares of stock to B. Tapper for cash at
par value, after the promoters and directors had issued to them-
selves 10 shares each gratuitously, was a fraud on Tapper.
(2)  The fraud on Tapper was ground for the rescission of the
contract of sale of stock to him. (3)  Rescission was made
promptly by Tapper after discovery of the fraud. (4)  Upon
the rescission of the sale of the stock to him, Tapper was entitled
to recover from the corporation the money paid by him. (5)

The corporation being in the hands of a receiver, Tapper is entitled to judgment and decree establishing as a claim against the receiver. (6) The individual defendants were the promoters of the corporation and the officers and directors thereof. As such, they are individually liable to Tapper for the damages sustained by him by reason of the fraud practiced upon him in the sale of the stock.''

But what *was* the alleged fraud practiced upon him? As we have repeatedly pointed out, this is to be tested by looking to the petition, to see what is there charged. That charge is, in express terms, that the defendants falsely represented to plaintiff the value of the assets of the corporation to be more than $7,000, and further falsely represented to him that they had paid for their shares of stock and that the money so paid was in the treasury of the company; and that, by such false and fraudulent representations, plaintiff was induced to rely thereon, and to subscribe and pay for 10 shares of the stock. These two propositions, and these alone, constitute the cause of action sued upon. If those representations had been proved, then the other things which counsel denounce as fraudulent would be proper evidence for our consideration; but, as we find there is a failure of proof of the alleged representations, it is, for the purposes of this appeal, immaterial whether defendants had or had not paid for their stock, or whether the assets of the corporation were worth more or less than $7,000. Plaintiff must stand or fall upon the case as it is made by the pleadings. He has not overcome the burden of proof which he assumed upon the issue so joined, and the decree rendered in his favor must be reversed.

In so ordering, it must be understood that, in so far as concerns the right, if any, of the corporation or of its creditors or receiver to proceed against the defendants to enforce their liability, if any, to pay the amounts of their several subscriptions, we make no pronouncement, and express no opinion. The receiver, though made a party to the case, has contented himself with simply filing a formal answer, denying knowledge or belief of the allegations in the petition, and *therefore denying the same*. He has asked no relief, was granted none by the trial court, and has not appealed.

For the reasons stated, the decree appealed from is—*Reversed.*

Evans, C. J., Preston and De Graff, JJ., concur.