## HAYWARD *v.* NATIONAL BANK.

A. borrowed of a bank money on call, and deposited with it as collateral security certain mining stocks, with written authority to sell them at its discretion. The loan remaining unpaid, the bank notified him that, unless he paid it, the stocks would be sold. He failed, after repeated demands, to pay it, and they were sold, for more than their market value, to three directors of the bank, and the proceeds applied to the payment of the loan. A., who was advised of the sale, and that enough had been realized to pay his indebtedness, made no objection. The stocks were transferred to the purchasers. Nearly four years after the sale, the stocks having in the mean time greatly increased in value, A. notified the bank of his desire and purpose to redeem them, and subsequently filed his bill against it asserting his right so to redeem, and praying for general relief. *Held*, that he is entitled to no relief.

APPEAL from the Circuit Court of the United States for the District of Massachusetts.

In the year 1863, Hayward, "for the purpose of opening a credit with the Eliot Bank," deposited certain securities with it, giving it power to transfer the same, as well as any bullion, coin, or other securities which he might thereafter deposit, and expressly waiving "all and every objection to the manner in which said securities may be sold, whether at public or private sale, or at the board of brokers, without any demand or notice

whatever:" Subsequently, the bank was converted into a national banking association, under the name of the Eliot National Bank; and, in the latter capacity, loaned, in October, 1866, to Hayward, first $6,500, and then $20,000, receiving in pledge, as security, four hundred and fifty shares of stock in the Hecla Mining Company, incorporated under the laws of Michigan, but having an office in the city of Boston. The loans were merely temporary, and were entered upon the demand-loan account of the bank. In order that the bank might have full control of the stock so pledged, Hayward caused it to be transferred to .R. B. Conant, to whom, as cashier, certificates, absolute in form, were issued for the whole four hundred and fifty shares. Hayward did not meet the loans as he had agreed, but made provision for the interest up to April 1, 1867. After that date he paid no interest. During that year, various assessments were made by the company upon its stock. He was notified of and requested to meet them, but failed to do so; and the bank, in order to save the security, and for its own indemnity, was compelled to pay them, amounting in the aggregate to $9,972.15.

On the 9th of November, 1867, Hayward executed and delivered to the bank the following paper : —

"BOSTON, Nov. 9, 1867.

"I hereby authorize the president and directors of the Eliot National Bank to sell, at their discretion, four hundred and fifty shares of stock of the Hecla Mining Company, held as collateral security for loan; proceeds of sale to be applied upon said loan.

"To the President and Directors of the Eliot Bank."

"CHAS. L. HAYWARD."

This paper was obtained because doubts were entertained whether the power of attorney given in 1863, when the bank was a State institution, was sufficient to authorize a sale of the stock by the national bank to pay Hayward's indebtedness to it.

After the transfer in October, 1866, the stock was at times greatly depressed in value, ranging from $15 to $70 per share. The latter was the ruling market price in August, 1868; but it was insufficient to reimburse the bank for its loan and interest, and the assessments on stock it had paid. The board of

directors, on the 18th of the latter month, passed an order directing the president of the bank to sell forthwith the Hecla mining stock, so held as collateral, unless Hayward paid upon his said loans $5,000 during that week, and a like amount during the following week.  Hayward was notified of this order, but did not comply with its terms.  Thereupon the president determined to dispose of the stock, in discharge of the bank's claim. Three of the directors, for the purpose, as the bank officers say, of preventing loss to the bank, in which they were stockholders, but for the further reason, doubtless, that they regarded it a safe investment, proposed to the bank to take the stock at $87 per share, which was above the market price, each director to take one hundred and fifty shares, and pay one-third of Hayward's indebtedness to the bank.  But, before they would carry this arrangement into effect, they insisted that Hayward be advised of their proposition.  The sale was consummated on the 8th of September, 1868; and on that day each of the directors paid, by assuming absolutely, one-third of the bank's claim against Hayward, and received in consideration thereof a new certificate for one hundred and fifty shares of stock.

Immediately after this sale, the bank sent to Hayward a statement of his account, showing its claim against him on account of his loans, interest, and assessments paid, to be $39,257.16, and closing with this credit: "Sept. 8, 1868, by cash, $39,257.16."

In 1871, the Hecla Mining Company and the Calumet Mining Company, also a Michigan corporation, were consolidated under the name of the Calumet and Hecla Mining Company. New stock was issued from time to time; and at the commencement of this action, instead of the four hundred and fifty shares originally held, the three directors held nine hundred shares in the consolidated company.  After the transfer of Sept. 8, 1868, they met all assessments upon the stock, and received individually such dividends as were declared thereon.

Other facts are stated in the opinion of the court:

This suit was instituted by Hayward against the bank, on the 14th of March, 1872, for the purpose of obtaining a decree, authorizing him to redeem the nine hundred shares of stock, and requiring the bank to transfer them to him, and to pay

over whatever might be due him, upon taking an account of the moneys received on the stock, and of his indebtedness to the bank by reason of said loans.

Neither the mining company nor the directors who purchased the stock were made defendants.

The bill was dismissed on a final hearing, and Hayward appealed to this court.

Mr. *E. F. Hodges* and Mr. *Jonathan F. Barrett* for the appellant.

Mr. *A. A. Ranney, contra.*

MR. JUSTICE HARLAN delivered the opinion of the court.

This bill seems to have been prepared upon the supposition that the bank held and owned the nine hundred shares of stock in the Calumet and Hecla Mining Company at the commencement of this action.   It is evident, however, that the bank's connection with the stock ceased Sept. 8, 1868, when it was sold to three of the bank directors.   After that date, the purchasers claimed and controlled the stock as their individual property, paid all assessments laid, and received all dividends declared. The evidence shows that the sale to them was absolute and unconditional; and the title which then unquestionably passed to them has ever since been uniformly recognized by the bank and the company. If the appellant is entitled, upon any ground whatever, to a transfer of the stock, such relief can only be given in a suit against the holders of it.

A large portion of the very elaborate argument made in behalf of the appellant was in support of the proposition that the bank, having received the stock in pledge to secure his indebtedness to it, could not, consistently with settled principles, buy from itself, and consequently could not sell to its directors. If these principles were at all applicable to this case, it would only follow that the bank, by violating its duty, had become liable to him for the value of the stock.   But such liability is not charged, nor is such relief asked.   The specific relief sought is a decree requiring the bank to transfer the stock to him, — a thing now beyond its power to do.   It is true that the bill contains a general prayer for such relief as may be consistent with equity and good conscience; but we incline to the opinion that

its whole frame and structure are inconsistent with a right in this suit to a decree for the value of the stock, even if the facts justified any such relief. 1 Dan. Ch. Pr. (3d Am. ed.) 382; *Chalmers et ux.* v. *Chambers*, 6 Har. & J. (Md.) 29; *Hobson* v. *McArthur*, 16 Pet. 182; *English* v. *Foxall*, 2 id. 595; *Thomason* v. *Smithson*, 7 Port. (Ala.) 144; *Driver* v. *Fortner*, 5 id. 9; *Strange* v. *Watson*, 11 Ala. 324.

But, waiving the consideration last mentioned, we discover nothing in the evidence which would entitle Hayward to a decree against the bank in any form of proceeding. The bank had the unquestionable right to sell the stock in satisfaction of his indebtedness. It is equally clear, that, with his assent, the stock could have been taken by the bank in discharge of such indebtedness, or sold to any of its directors. Where such assent is clearly shown, and the sale to them was unattended by circumstances of fraud, unfairness, or imposition, we perceive no sound reason why it should not be upheld, especially after an unreasonable and unexplained lapse of time, without objection or complaint by him. Prior to the sale, he was often requested by the bank to take up his notes, and meet the assessments upon the stock. He failed to do either, and the bank was compelled to provide for the assessments. The indulgence extended to him by the bank was characterized by the utmost liberality. It was all that he could have expected or demanded. When, therefore, he was informed (as we do not doubt he was) of the settled purpose of the bank to sell the stock, and of the proposition of the three directors to purchase it, it was his duty, if he disapproved of the latter arrangement, to give expression, in some form, to that disapproval. So far from expressing disapproval, the weight of the evidence is that he gave his consent. It is quite certain that the directors made the purchase in the belief that he had been advised of their proposition, and had assented to its acceptance by the bank. The most favorable construction for him which can be put upon the evidence is, that he was silent when notified of the proposition, and made no objection to its acceptance. His silence, however, under the circumstances, taken in connection with his subsequent conduct, should be held as conclusive as if he had originally assented, in express terms, to the sale. If it be suggested that, after having

been informed of the proposition of the directors, sufficient time was not allowed him for deliberation before the sale was made, and if he could have repudiated it for that reason, and reclaimed the stock, there is still no satisfactory explanation of his course after he learned that a sale had actually occurred. He was promptly advised of it, and of the amount realized therefrom. He received, at the same time, an itemized account, showing the amount claimed by the bank upon the original loans, as well as for interest and for advances to meet assessments. That account, it is true, contained no statement, in terms, of the sale, nor did it give the names of the purchasers. But he admits, in his cross-examination, that he was informed by the person who delivered the account that the stock had been sold, and that he understood the credit of $39,257.16 to denote the sum realized from such sale. There was no other mode, as he well knew, by which he could become entitled to so large a credit. He disputed no item in the account, expressed no disapproval of what had been done, and made no complaint to the bank of its action. Although he was well acquainted with the bank officers, and met them frequently after the sale, often upon terms of familiar intercourse, he made no inquiry on the subject. He gave no intimation either of dissatisfaction or of any purpose to repudiate the sale and look to the bank for the value of the stock. He says that he felt "too castaway to speak to anybody; . . . couldn't help himself, nor pay the loan; cared very little about any thing." If, as soon as he was notified of the sale, he had the right to repudiate it, and compel the bank to recover the stock, such a course would have profited him nothing, since the three directors paid more for the stock than it was then worth; and the bank, under its express authority to sell, could have put it at once upon the market. It was this consideration which perhaps induced him to remain silent and inactive for more than three years and a half. During all that period he neither paid, nor offered to pay any interest to the bank, although his present suit rests upon the basis that the bank had an unsettled account with him, embracing a valid subsisting debt, upon which, he now concedes, it is entitled to interest; and he permitted the bank and the purchasing directors to act in the belief that he was content with their action,

and that the money realized from the sale had been properly applied to the payment of his indebtedness.   Although all the time conversant with the market value of such stock, he made no demand upon the company for dividends declared, nor did he protest against the payment of them to others.   Finally, the extraordinary advance in the market price of the stock caused him to break the silence which he had so long and so persistently maintained, and, in March, 1872, he formally notified the bank of his desire and purpose to redeem the stock, although he knew, or could have ascertained upon inquiry, either at the bank or at the office of the company in Boston, that the bank had not held or controlled the stock in any form, directly or indirectly, after the sale in September, 1868.

The facts present insuperable obstacles to any decree in favor of the appellant.   If the sale made by the bank was originally impeachable by him, the right to question its validity was lost by his acquiescence.   He was in a condition, immediately after the sale, to enforce such rights as the law gave him, as he was fully apprised of their nature, and of all the material facts of the case.   He now claims that the sale was in derogation of his rights and injurious to his interests; and yet his conduct was uniformly inconsistent with any purpose to repudiate the sale or assert ownership of the stock.   His course was continuously such as to induce a reasonable belief of his fixed determination to abide by the action of the bank.   He remained silent when he should have spoken.   He will not be heard now, when he should be silent.   He must be held to have waived and abandoned the right, if any he had, to impeach the transaction of Sept. 8, 1868.

But the appellant is equally concluded by the lapse of time during which that transaction has been allowed to stand, without any effort upon his part to impeach it.   It must now be regarded as unimpeachable.

Courts of equity often treat a lapse of time, less than that prescribed by the Statute of Limitations, as a presumptive bar, on the ground " of discouraging stale claims, or gross laches, or unexplained acquiescence in the assertion of an adverse right." 2 Story, Eq. Jur., sect. 1520.  In *Smith* v. *Clay* (Amb. 645), Lord Camden said: " A court of equity, which is never active

in relief against conscience or public convenience, has always refused its aid to stale demands, when the party has slept upon his right, and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence. When these are wanting, the court is passive, and does nothing. Laches and neglect are always discountenanced." These doctrines have received the approval of this court in numerous cases. *Twin Lick Oil Co.* v. *Marbury,* 91 U. S. 587; *Badger* v. *Badger,* 2 Wall. 87; *Marsh* v. *Whitmore,* 21 id. 178; *Harwood* v. *Railroad Company,* 17 id. 79. In the last-named case, this court said, that, without reference to any statute of limitation, equity has adopted the principle that the delay which will defeat a recovery must depend upon the particular circumstances of each case. The question of acquiescence or delay may often be controlled by the nature of the property which is the subject of litigation. "A delay which might have been of no consequence in an ordinary case, may be amply sufficient to bar relief when the property is of a speculative character, or is subject to contingencies, or where the rights and liabilities of others have been in the mean time varied. If the property is of a speculative or precarious nature, it is the duty of a man complaining of fraud to put forward his complaint at the earliest possible time. He cannot be allowed to remain passive, prepared to affirm the transaction if the concern should prosper, or to repudiate it if that should prove to his advantage." Kerr, Mistake and Fraud (Bump's ed.), pp. 302, 306; *Twin Lick Oil Co.* v. *Marbury, supra.*

If Hayward was defrauded of his stock,—if the title did not pass from him or the bank because of the peculiar relations which the purchasers held to him and the property; if he had the right originally upon any ground to repudiate the sale and reclaim the stock,—it was incumbent upon him, by every consideration of fairness, to act with diligence, and before any material change in the circumstances and in the value of the stock had intervened. No sufficient reason is given for the delay in suing. His poverty or pecuniary embarrassment was not a sufficient excuse for postponing the assertion of his rights. He must be deemed to have made a final election not to disturb the sale of 1868; and a court of equity should not permit him,

under the circumstances, to recall that election. Upon the grounds, then, both of acquiescence and lapse of time, he should be held to have forfeited all right to relief in a court of equity.

For the reasons given, and without discussing other questions of minor importance, the decree should be affirmed; and it is

*So ordered.*