The CITY AND BOROUGH OF JU-
NEAU, and Kiewit Construction
Company, Petitioners,

v.

Betty BRECK, a/k/a "Belle
Blue," Respondent.

No. S–661.

Supreme Court of Alaska.

Sept. 20, 1985.

Rehearing Dismissed Nov. 5, 1985.

Avrum Gross and Susan Burke, Gross &
Burke, Juneau, for petitioner City and
Borough of Juneau.

John E. Casperson and Lawrence T. Fee-
ney, Faulkner, Banfield, Doogan &
Holmes, Juneau, for petitioner, Kiewit
Const. Co.

Betty Breck, pro per.

Before RABINOWITZ, C.J., and
BURKE, MATTHEWS, COMPTON and
MOORE, JJ.

OPINION

RABINOWITZ, Chief Justice.

The superior court granted Breck's re-
quest for a preliminary injunction, stopping
further work under the contract between
the City and Borough of Juneau (CBJ) and
the Kiewit Construction Company for the
construction of a parking structure and
tourist facility located on Juneau's water-
front. Breck alleged, in part, that the mul-
ti-million dollar contract was illegal and
void because it violated the CBJ charter
and ordinance code, which requires CBJ to
award contracts for public improvement
projects through a competitive bidding pro-
cedure to the lowest bidder. At the time
the superior court issued its preliminary
injunction the structure was approximately
50 per cent completed.[1]

---

**1.** It was originally anticipated that the facility
would be available for public use by the end of
1984.

The superior court issued the preliminary injunction after it found that Breck had demonstrated a high probability of success on the merits, and that Breck had shown irreparable injury for which there was no adequate and complete remedy at law: "the harm [being] that the safeguards that were incorporated into the basic Charter, the basic law of this community, have been disregarded, set aside, and that this is a wrong, per se, to all the citizens and taxpayers of this community, even if it saves money."

CBJ thereafter filed a petition for review in which it argued, in part, that this court should reverse the superior court's laches ruling (1) because it was erroneous, (2) because of the financial hardship the city experienced as a result of the preliminary injunction, and (3) because a reversal of the superior court's determination would materially advance the resolution of this litigation.[2] We granted the petition for review and dissolved the preliminary injunction. This court's order reads in part:

> The superior court's ruling as to whether the equitable defense of laches should bar respondent Breck's claims for injunctive relief is REVERSED. Breck's delay in instituting this action was inexcusable and resulted in undue prejudice to Petitioner City and Borough of Juneau. Therefore, laches bars any claims on Breck's part for injunctive relief against Petitioners.... The matter is REMANDED for further proceedings not inconsistent with this order. More particularly, for determination of Breck's declaratory judgment action and any other non-injunctive relief deemed appropriate in the circumstances.[3]

**2.** Kiewit Construction Company joined in the petition.

**3.** Justices Burke and Matthews dissented, stating that "[i]n their view, the Superior Court's ruling on laches is not an abuse of discretion. Since the petition for review has been granted by a majority of the court, they would affirm the ruling of the Superior Court concerning laches."

**4.** CBJ ordinance 53.50.040(a) provides that "[c]ontracts for public improvements for an

FACTS

On December 9, 1983, CBJ first publicly announced its intention to seek "design-build" proposals for construction of a parking garage and marine park adjacent to the downtown Juneau waterfront. Proposals were accepted up until March 2, 1984. One month later, on April 4, the City selected the plan that Kiewit Construction had submitted. A contract was executed on May 3, 1984, for a total contract price of $5,075,-000. Under the terms of the contract a substantial portion of the project was to be completed over an eight month period; the parties expected the first three floors of the parking garage to be operational by December 31, 1984.

Sometime in late March after proposals were solicited, but before acceptance of Kiewit's plan, Betty Breck became aware of possible charter and code violations and approached the mayor with her concern. On April 2, Betty Breck made the first of at least nine appearances before the assembly to express her concern that the "design-build" method of bidding and construction did not conform with Section 9.14 of the CBJ Charter, which requires that contracts for public improvements be let by competitive bid.[4] Breck continued to appear before the borough assembly after the award of the contract to Kiewit. Additionally, Breck was aware that construction had begun in the middle of May.

Breck contends that she did not realize until the end of June that she "would not get anywhere" talking to the borough assembly, and it was then that she began preparing for the lawsuit. Since she was

amount estimated to exceed fifteen thousand dollars shall be by competitive sealed bid and be awarded to the lowest qualified bidder." The City Charter has a similar provision, and also provides that obligations incurred in violation of the charter are void. Section 9.13(b), 9.14. Exempt from the competitive bidding requirements are "contracts involving the obtaining of professional services such as, but not limited to, services rendered by architects, attorneys, engineers, and other specialized consultants." CBJ Code § 53.50.090(a).

financially unable to hire counsel, and was unsuccessful in soliciting the assistance of the three contractors whose proposals were rejected, Breck proceeded to master the legal procedures herself, spending eight hours a day in the law library up until the time she filed suit on August 24, 1984.[5] Thus, Breck filed suit approximately eight months after the city advertised its intent to seek "design-build" proposals, four months after the contract with Kiewit Construction was signed, and after approximately 50 per cent of the project was completed.[6]

LACHES

In *Moore v. State*, 553 P.2d 8, 15 (Alaska 1976), this court said that the question of whether laches bars a suit is "properly addressed to the discretion of the trial court and will not be overturned [absent] a definite and firm conviction that a mistake has been committed."[7] In *Moore* we further stated that the defendant must show two "independent" elements before the equitable defense of laches will be applied. The defendant must show, (1) that the plaintiff has unreasonably delayed in bringing the action, and (2) that this unreason-

able delay has caused undue harm or prejudice to the defendant.[8] *Id.* Since the superior court concluded that Breck did not unreasonably delay in bringing the action, it did not really consider the extent of the injury to CBJ.

In applying the two-element test of *Moore*, one of the factors to be considered in measuring the plaintiff's delay is when, under the circumstances, it becomes no longer reasonable for the plaintiff to assume that the defendants would comply with the law.[9] Additionally, the court will "look to that point in time when there were positive steps taken by defendants which made their course of conduct irrevocable, and would have galvanized reasonable plaintiffs into seeking a lawyer."[10] *Id.* at 17.

In part, the superior court decided that Breck did not unreasonably delay in instituting suit because members of the assembly had given her grounds to believe that they would respond to her concerns. In its decision, the superior court noted that on June 4, 1984, the assembly agreed to place the matter on their next meeting's agenda, and that it was not until after the assembly

---

**5.** In their petition for review petitioners argued in part that Breck:

> was aware of opinions issued by the city attorney in May that the contract was valid.... The assembly itself was unequivocal in their commitment to continue with construction.... At no time was [Breck] ever told by anyone in the borough administration that recision of the contract was even being considered, and work on the project proceeded on a daily basis.

**6.** At the time the superior court issued its preliminary injunction, pilings had been driven, and work had commenced on the walls of the project.

**7.** *See also Pavlik v. State*, 637 P.2d 1045, 1047 (Alaska 1981).

**8.** *See also Sheehan v. Estate of Gamberg*, 677 P.2d 254, 258 n. 8 (Alaska 1984); *Concerned Citizens of So. Kenai v. Kenai Pen. Bor.*, 527 P.2d 447, 457 (Alaska 1974).

**9.** In *Moore* we also said:

> [I]n determining when laches should be applied, our concern is not so much with when

the alleged wrong occurred, as it is with when, in light of any resulting prejudice to defendants, it became reasonable to expect plaintiffs to act upon the wrong.

*Id.* at 16.

**10.** In *Moore* the plaintiffs (commercial fishermen) were seeking to set aside the state's sale of oil leases in the Kachemak Bay area, alleging that the sale was illegal on a number of grounds. The superior court granted the state's summary judgment motion on the issue of laches, and this court reversed. Plaintiffs' filed suit about one year after the sale, but only three weeks after the first drilling permits were issued for the area. In the interim, they pursued legislative and alternative remedies. This court said that "we will not penalize plaintiffs too heavily for any delay resulting from attempts to reach a more amicable resolution of the problem." *Id.* at 18 (footnote omitted). This court noted that the pursuit of alternative remedies will not always excuse laches. *Id.* at 18 n. 14. In *Moore*, however, a balancing of all the factors, including the strong public interest in the development of Alaska's resources, led us to conclude that the superior court erred in holding that the prosecution of plaintiffs' claim would be inequitable.

had failed to act at the June 18 meeting that it should have become plain to Breck that she would have to turn to the courts for relief.

CBJ contends that a reasonable person would have known long before June that the City had embarked on a course of action that it would not alter unless forced to. To support this contention, they argue that Breck should have realized that the large financial commitment, and the delay that would result if the contract was declared void, made such a change inconceivable.[11]

■ We are in agreement with petitioners' position, and reverse the superior court's resolution of the laches issue. In our view, once the contract was signed and construction commenced, a reasonable person would have realized that CBJ would not change its mind with respect to the project. In short, we hold that the signing of the contract and the commencement of work under the contract would have galvanized a reasonable plaintiff into seeking a lawyer. *See Moore v. State,* 553 P.2d at 17.

**11.** There is nothing in the record to suggest that, once construction began, the city had any intention to voluntarily change its position in any shape, manner or form.

**12.** Breck apparently did not begin to prepare the suit until after it became clear to her in June that the assembly would not change its mind and rescind the contract. She could not afford counsel and could not convince any attorney to assist her.

**13.** Authority exists for the proposition that lack of funds does not constitute a sufficient excuse for delay in asserting one's rights. In *Leggett v. Standard Oil Co.,* 149 U.S. 287, 294, 13 S.Ct. 902, 904, 37 L.Ed. 737 (1893), the court used the following language:
No sufficient reason is given for this delay in suing. It is sought to be excused on the ground of the plaintiff's poverty during this period; but in the case of Hayward v. Eliot Nat. Bank, 96 U.S. 611, 618 [24 L.Ed. 855], this court said that a party's poverty or pecuniary embarrassment was not a sufficient excuse for postponing the assertion of his rights.
*See also Newman v. Board of Civil Service Commissioners,* 140 Cal.App.2d 907, 296 P.2d 41, 43 (1956); 27 Am.Jur. § 165, p. 708.

■ In reaching our holding on the laches issue, we reject the superior court's conclusion that Breck's delay in bringing suit was excusable because, considering her lack of knowledge about how to bring a lawsuit, she did the best she could in the circumstances.[12] Implicit in the superior court's view is the notion that delay resulting from insufficient resources is always a valid excuse, so long as the plaintiff proceeds in as diligent a manner as possible. We think such an approach is inappropriate.[13] Although this element should be factored into the equity equation, the question cannot be simply one of negligence.[14]

■ Prejudice to the taxpayers of CJB is a relevant consideration in making a laches determination. In his affidavit, Chris Roust, an architect employed by CBJ, estimated that "the total additional cost of cancelling the current contract and then proceeding with conventional design-bid contraction [sic] would be between $1,500,000 and $2,000,000." Keith Gerken, a private architect employed in Juneau and hired by CBJ to estimate the loss, concluded that "the injunction now in force will cost CBJ and its residents as much as 1.5 million dollars and probably more." [15]

However, we decline to adopt the rule expressed by *Leggett* and *Newman.* In our view, such a rule embodies an approach which is too inflexible.

**14.** In *Moore v. State,* 553 P.2d 8, 19 (Alaska 1979) we said that laches is essentially a
matter of balancing the equities of a particular case to determine whether plaintiffs are guilty of inequitable delay.
We also stated:
The point in time at which plaintiffs must exercise their remedies in court or lose their right to assert their cause of action depends on the facts and equitable considerations of each case, including the knowledge of the plaintiffs, the conduct of the defendants, the interest to be vindicated, and the resulting prejudice.
*Id.* at 16.

**15.** According to Roust, the additional cost is due to: (1) inflation resulting from the delay; (2) demobilization of the current contractor; (3) additional claims of lost profit and unreimbursed design costs to Kiewit; (4) cost of conducting another bidding procedure; (5) mobilization of a new contractor; (6) insurance costs; (7) unknown factor of a new contractor moving

Based on the foregoing, it is our conclusion that the superior court erred in refusing to apply the equitable doctrine of laches to Breck's claims for injunctive relief. In our view, petitioners demonstrated that Breck was guilty of inexcusable delay in instituting this action for injunctive relief, and that her inexcusable delay resulted in undue prejudice to petitioner CBJ.[16] The superior court should have given due consideration to such prejudice.

We therefore hold that the equitable defense of laches is a bar to Breck's claims of injunctive relief against petitioners.

REVERSED.

BURKE and MATTHEWS, JJ., dissenting.

BURKE, Justice, with whom MATTHEWS, Justice, joins, dissenting.

I dissent from the holding that Breck's action is barred by laches.

The trial court found that Breck gave ample notice of her opposition to the project and the reasons for it, and did not, under the circumstances, unreasonably delay in bringing suit. The court found also that the alleged injury to petitioners was not caused by Breck's delay, but rather by their own haste in proceeding with the project despite the serious questions raised concerning the legality of the bidding procedures. In reaching its decision, the trial court gave careful consideration to the evidence before it, and I am unable to say that the court's findings were clearly erroneous. In light of these findings, I do not see how

we can now say: "Breck was guilty of inexcusable delay in bringing this litigation ... and ... her inexcusable delay resulted in undue prejudice to petitioners." We are not entitled to substitute our judgment for that of the trial court.

I would affirm the judgment. *Moore v. State*, 553 P.2d 8 (Alaska 1976).

---

into a partially completed job; and (8) legal fees. Gerken adds the following to the list: (9) cost increases due to climatic factors, (10) limited liability of second contractor for errors in work already performed, and (11) damage to the people and industry of Juneau due to the continuation of the downtown parking problem. Breck, on the other hand, contends that rebidding in the proper manner will result in a substantial savings for the City and Borough. However, petitioners' evidence concerning cost increases was not contested by Breck.

**16.** In *Concerned Citizens of So. Kenai v. Kenai Pen. Bor.,* 527 P.2d 447, 457 (Alaska 1974) we said in part:

No specific time must elapse before the defense of laches can be raised because the propriety of refusing to hear a claim turns as much upon the gravity of the prejudice suffered by the defendant as the length of a plaintiff's delay.

In our decisions we have noted the inter-dependence between the elements of delay and prejudice. *See Wolff v. Arctic Bowl, Inc.,* 560 P.2d 758, 767 (Alaska 1977); *Moore v. State,* 553 P.2d 8, 15–16 (Alaska 1976). In *Pavlik v. State,* 637 P.2d 1045, 1048 (Alaska 1981) we said: "Thus, where there is a long delay, a lesser degree of prejudice will be required." (footnote omitted).