Betty BRECK, Appellant,

v.

Frances Anne ULMER, Fred Baxter, Bruce Botelho, Kay (Kathleen) Diebels, Peter Freer, James M. (Jamie) Parson, Richard Poor, Hugh (Noel) Grant, and Ed Kalwara, Appellees.

No. S–1615.

Supreme Court of Alaska.

Nov. 6, 1987.

Betty Breck, pro se.

Susan A. Burke, Avrum M. Gross, Gross & Burke, Juneau, for appellees.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Chief Justice.

### I. INTRODUCTION.

This appeal arises from the second action filed by Betty Breck in connection with the City and Borough of Juneau's (CBJ) decision to seek "design-build" proposals for the construction of a parking garage and marine park adjacent to the downtown Juneau waterfront. *See City and Borough of Juneau v. Breck (Breck I)*, 706 P.2d 313 (Alaska 1985). The principal issues herein are whether the superior court erred in granting the CBJ mayor and assembly members' motion for summary judgment based on their claimed immunity from suit, and whether the superior court committed prejudicial error in denying Breck's motion for leave to file a reply to the defendants' answer. We affirm.

### II. FACTS AND PROCEEDINGS.

In addition to the facts set forth in *Breck I*,[1] relevant here are the actions of the CBJ assembly members and mayor (hereinafter collectively referred to as "the assembly members")[2] allowing the city manager to negotiate and execute a contract with the Kiewit Construction Company (Kiewit).

On March 8, 1984, the city manager asked the assembly to express its non-ob-

1. As we indicated in the original action, the facts are as follows:

On December 9, 1983, CBJ first publicly announced its intention to seek "design-build" proposals for construction of a parking garage and marine park adjacent to the downtown Juneau waterfront. Proposals were accepted up until March 2, 1984. One month later, on April 4, the City selected the plan that Kiewit Construction had submitted. A contract was executed on May 3, 1984, for a total contract price of $5,075,000. Under the terms of the contract a substantial portion of the project was to be completed over an eight month period; the parties expected the first three floors of the parking garage to be operational by December 31, 1984.

Sometime in late March after proposals were solicited, but before acceptance of Kiew-

it's plan, Betty Breck became aware of possible charter and code violations and approached the mayor with her concern. On April 2, Betty Breck made the first of at least nine appearances before the assembly to express her concern that the "design-build" method of bidding and construction did not conform with Section 9.14 of the CBJ Charter, which requires that contracts for public improvements be let by competitive bid. Breck continued to appear before the borough assembly after the award of the contract to Kiewit.

*Breck I,* 706 P.2d at 314.

2. The mayor is also a member of the assembly. Charter, City & Bor. of Juneau § 3.2.

jection to his commencing negotiations with Kiewit for the construction of the parking garage. The assembly did not object, and at its next meeting formally affirmed the manager's recommendations for the selection of the Kiewit proposal. Beginning on April 2, 1984, Breck made the first of several appearances expressing her concern that the "design-build" method of construction did not conform with competitive bid requirements of the CBJ charter.[3] The assembly nevertheless awarded the contract to Kiewit in May, 1984.

In Breck's first action, the superior court granted her motion for a preliminary injunction against CBJ and Kiewit, based on her allegations that the multi-million dollar contract awarded violated the CBJ charter and ordinance code. We reversed, holding that Breck's claims were barred by the equitable defense of laches because of her "inexcusable delay in instituting this action for injunctive relief" and the resulting "undue prejudice" to CBJ (the structure being approximately 50% completed). *Breck I*, 706 P.2d at 314, 317. We dissolved the injunction and remanded the case for determination of Breck's declaratory judgment action and any other non-injunctive relief deemed appropriate in the circumstances. *Id.* at 314.

On remand, Breck amended her complaint to add several new grounds to support her claim that the contract was void, and to add a claim against Kiewit for restitution of all funds paid under the contract. CBJ and Kiewit moved for summary judgment on all counts of her amended complaint. Before the court ruled on these motions, Breck unsuccessfully sought a temporary restraining order to enjoin the assembly from appropriating money to fund a settlement agreement reached between CBJ and Kiewit. (The agreement settled Kiewit's claims for damages against CBJ for construction delays resulting from the superior court's injunction.)

Subsequently, on July 12, 1985, the superior court ruled on the summary judgment motions, dismissing Breck's complaint on the ground that laches barred her from obtaining either declaratory relief or restitution. Breck subsequently obtained an order for voluntary dismissal of her appeal from the superior court's order dismissing her complaint.

On May 20, 1985, Breck filed the instant suit, seeking to hold assembly members who held office during the events leading up to and immediately following the award of the contract personally liable for payments allegedly authorized in violation of the CBJ Charter. Breck alleged that the defendants knowingly violated Chapter 53.-50 of the CBJ Code (hereinafter "CCBJ") and section 9.14 of the CBJ Charter, both of which require contracts for public improvements to be awarded to the lowest qualified bidder on a competitive bidding process, by allowing the assistant city manager to sign the contract with Kiewit, the highest bidder.[4] Breck alleged that she repeatedly advised the defendants that the contract violated the above provisions and urged reassignment of the contract. She further alleged that she had read CBJ Charter § 9.13(b) to the assembly members when they were considering appropriating $1 million for the project. That section provides in part:

Every payment made in violation of the provisions of this Charter shall be illegal.

---

**3.** "Design-build" bidding is based on the fact that the city has a fixed amount to spend and seeks competitive designs from consortiums of architects, engineers and contractors to achieve the maximum project for that amount. The winning design is selected from among those submitted using a point system. "Design-build" has been used to construct a number of public projects in Juneau and is commonly used by the state, which has similar competitive bidding requirements.

**4.** CBJ Charter § 9.14 provides:

*Competitive Bidding.* The assembly by ordinance shall provide for competitive bidding and procedures for competitive bidding. Contracts for public improvement and, whenever practicable, other purchase of supplies, materials, equipment, and services, except professional services and services of officers and employees of the municipality, shall be by competitive bid and awarded to the lowest qualified bidder. All contracts and purchases exceeding an amount to be established by ordinance shall require prior assembly approval.

All officers or employees of the municipality who knowingly authorize or make such payment shall be jointly and severally liable to the municipality for the full amount so paid. The manager shall proceed forthwith to collect the indebtedness unless otherwise directed by the assembly.

Based on this provision, Breck sought to require the assembly members to repay the municipality the sum already paid under the contract plus any future payments, and to prohibit the expenditure of public funds for their attorney's fees. The assembly members timely answered. Breck then filed a response to their answer, attaching public records to substantiate her allegations. Upon learning that a reply pleading requires leave of court, Breck—who is without the assistance of counsel—filed a motion requesting such leave. The assembly members did not move to strike Breck's response or object to her motion for leave to file that document.

The assembly members moved for summary judgment asserting their immunity from suit on the ground that their actions in regard to the parking garage were undertaken in the course of their legislative duties. They further argued that CBJ Charter § 9.13 did not apply to assembly members, and that even if it did apply, AS 09.65.070(d)(2) shielded them from personal liability because their actions were discretionary in nature.[5] Finally, they argued that no liability could attach because they did not knowingly authorize "illegal payments."

Breck opposed the motion and responded that genuine issues of fact existed as to whether the assembly members were "officers" or "employees" of the municipality and thereby liable under the charter, whether the assembly members were im-

mune from liability under state law, and whether they knowingly violated the charter. Breck did not include the evidence previously submitted with her reply pleading but referred the court to that document "[f]or a more detailed listing of the facts which [Breck] has alleged and [the assembly members] have denied."

The superior court granted the motion for summary judgment, concluding that the assembly members "were clearly acting within the sphere of legislative activity and are, therefore, absolutely immune from personal liability for their legislative acts." The court agreed with the assembly members that the acts in issue were legislative in nature, and that CBJ Charter § 9.13(b) did not apply to the members and therefore did not abrogate their legislative immunity.

Breck subsequently moved for reconsideration, arguing that the nature of the assembly members' conduct was ministerial and mandatory, rather than discretionary, and that they thus were not entitled to immunity. She argued in essence that the assembly members breached their duty to ascertain and approve the lowest qualified bidder. The superior court denied Breck's motion for reconsideration as well as her earlier motion for leave to file a response to the defendants' answer. This appeal followed.

### III. DID THE SUPERIOR COURT ERR IN GRANTING THE ASSEMBLY MEMBERS' MOTION FOR SUMMARY JUDGMENT ON GROUNDS OF PERSONAL IMMUNITY?

Breck contends that the superior court erred in holding that the assembly members enjoy absolute immunity from personal liability in regard to their conduct and granting the motion for summary judgment on that basis.[6]

---

**5.** AS 09.65.070(d)(2) provides:

No action for damages may be brought against a municipality or any of its agents, officers or employees if the claim

. . . .

(2) is based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty by a municipality or its agents, officers, or employees,

whether or not the discretion involved is abused.

**6.** In reviewing a grant of summary judgment, we must draw all inferences of fact in favor of the non-moving party. *Kodiak Elec. Ass'n v. DeLaval Turbine, Inc.,* 694 P.2d 150, 152 n. 1 (Alaska 1984). The moving party has the burden of proving that his opponent's case has no merit. *Riley v. Northern Commercial Co.,* 648

### A. *Common Law Immunity.*

### 1. *Absolute Immunity for Legislative Acts.*

The assembly members argue that their adoption of ordinances appropriating money for construction under a contract is a legislative act within the scope of common law legislative immunity. Breck contends that the act which leads to liability here is not the passage of these ordinances but rather the assembly's approval of the parking garage and marine park contract award. The assembly members take the position that immunity also attaches to the approval of this contract because, since they have the option to approve or disapprove a proposed contract, such approval is a discretionary function within the coverage of AS 09.65.070(d)(2). *See supra* note 5. Breck counters that assembly approval is not discretionary because CBJ Charter § 9.14 precludes the members from awarding a public improvement contract by any means other than competitive bidding to the lowest bidder and CCBJ § 53.50.060(d)(1) prohibits the manager from awarding a contract over $50,000 without their approval.

The law of immunity for legislative officers is well settled and extends to local legislators when acting in their legislative capacities. *See generally* 4 E. McQuillin, *The Law of Municipal Corporations* § 12.222, at 238–39 (rev. 3rd ed. 1985).[7] We have previously held that state officials

enjoy absolute immunity for their legislative acts, *see State v. Haley,* 687 P.2d 305, 319 (Alaska 1984); *Kerttula v. Abood,* 686 P.2d 1197, 1202–04 (Alaska 1984), but until today we have not addressed the scope of legislative immunity for local officials.

■ The fact that a local legislator takes some action is not necessarily dispositive of whether his or her act is legislative. Even voting on a particular item is not necessarily a legislative act. In *Cinevision Corp. v. City of Burbank,* 745 F.2d 560, 580 (9th Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2115, 85 L.Ed.2d 480 (1985), the court held that in voting to disapprove all of Cinevision's proposed concerts for the 1979 season, a city councilman acted in his executive, rather than legislative capacity, and therefore enjoyed only qualified immunity. The court reasoned that the city council by voting on various proposed concerts was simply monitoring and administering the contract between Cinevision and the city, and that administration of a municipal contract does not involve the formulation of policy but "is more the type of ad hoc decisionmaking engaged in by an executive."[8] *Id.* In reaching this result, the court explained:

> In deciding whether an act is legislative, we must look at the nature of the act rather than simply at which institution acted. "Those entitled to absolute immunity have it 'because of the special

---

P.2d 961, 966 (Alaska 1982). If, after examining the record, we discover the existence of a genuine issue as to any material fact, or if it appears that the prevailing party was otherwise not entitled to judgment as a matter of law, we must reverse the order and remand the case for trial. *Ellis v. City of Valdez,* 686 P.2d 700, 702 (Alaska 1984).

**7.** The federal circuit courts have responded to the Supreme Court's decision in *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 405, 99 S.Ct. 1171, 1179, 59 L.Ed.2d 401, 413 (1979), which held that individual members of a regional governmental body are entitled to absolute immunity from damage claims under 42 U.S.C. § 1983 when acting in a legislative capacity, by conferring such immunity on local legislators for legislative acts. *See Cinevision Corp. v. City of Burbank,* 745 F.2d 560, 577 & n. 22 (9th Cir.1984), *cert. denied,* 471

U.S. 1054, 105 S.Ct. 2115, 85 L.Ed.2d 480 (1985) (noting that every circuit addressing the issue had extended *Lake Country Estates* to provide absolute immunity to local legislators acting in a legislative capacity); *e.g., Aitchison v. Raffiani,* 708 F.2d 96, 98–99 (3d Cir.1983); *Hernandez v. City of Lafayette,* 643 F.2d 1188, 1194 (5th Cir.1981), *cert. denied,* 455 U.S. 907, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982) (holding that veto of an ordinance by the mayor was a legislative act entitled to absolute immunity); *Gorman Towers, Inc. v. Bogoslavsky,* 626 F.2d 607, 611–14 (8th Cir.1980). *See generally* S. Nahmod, *Civil Rights and Civil Liberties Litigation: The Law of Section 1983* § 7.05 (2d ed. 1986).

**8.** The court in *Cinevision Corp.* expressly declined to decide whether a local legislator's vote to enter into a contract with a private party would be a legislative or an executive action. 745 F.2d at 580 n. 29.

nature of their responsibilities' rather than 'because of their particular location within the Government....' "

For that reason, not all governmental acts by a local legislator, are necessarily legislative in nature. *Although a local legislator may vote on an issue, that alone does not necessarily determine that he or she was acting in a legislative capacity.* Rather, "[w]hether actions ... are, in law and fact, an exercise of legislative power depends not on their form but upon 'whether they contain matter which is regarded as legislative in its character and effect.' " "The essentials of the legislative function are the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct." *Id.* at 579–80 (emphasis added, citations and footnotes omitted). *See also Abraham v. Pekarski*, 728 F.2d 167, 174 (3rd Cir.), *cert. denied*, 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984) ("The fact that the action complained of resulted from a vote of the members of the governing body is not dispositive, for in the exercise of non-legislative powers all corporate bodies require a vote of their governing bodies.").

In determining whether the acts of legislators are legislative or executive, the federal courts generally have distinguished between acts which have general applicability or involve policymaking ("legislative") as opposed to those which represent a specific application of a particular policy ("administrative"). *See, e.g., Rogin v. Bensalem Township*, 616 F.2d 680, 692–93 & n. 60 (3rd Cir.1980), *cert. denied*, 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981); *Unity Ventures v. County of Lake*, 631 F.Supp. 181, 206–07 (N.D.Ill.1986); *Kuchka v. Kile*, 634 F.Supp. 502, 508 (M.D.Pa. 1985).[9] Similarly, we noted in *Haley* that "[t]he application of legislation to specific situations is generally not within the scope of legislative immunity," and accordingly

held that the termination of Haley's employment was an administrative act rather than a legislative one. 687 P.2d at 319.

Therefore, we hold that the acts of local legislators are legislative only if their acts have general applicability or involve policy making, as opposed to being a specific application of a particular policy. In the case at bar, the local legislature acted to select one of several contractors, and was thus applying its policy of building this particular project to the specific proposals. The dichotomy we have just endorsed between legislative and administrative acts compels us to find that this action was administrative and thus that the assembly members are not entitled to absolute immunity.

### 2. *Qualified Immunity.*

The question remains whether the assembly members are entitled to immunity for their administrative or executive acts.[10] We are thus required to address the question we expressly left open in *Aspen Exploration Corp. v. Sheffield*, 739 P.2d 150, 162 n. 23 (Alaska 1987); that is, what standard should be applied to determine whether qualified immunity exists when a public official is alleged to have violated a statute or the Alaska Constitution. While our recent decision in *Aspen* controls only the scope of immunity to be conferred for executive acts alleged to have violated common law rights, the same policy considerations and factors are also pertinent here. Protecting the exercise of judgment of local officials from the undue interference caused by the threat of litigation is necessary to promote the public interest.

We choose to follow federal precedent for determining whether qualified immunity should be conferred for executive acts alleged to contravene a statutory or

---

9. We recognize that these cases focus on the scope of common law immunity for purposes of determining liability for violations of federal law under 42 U.S.C. § 1983. We find their reasoning apposite to the question we face here.

10. In this regard, we point out that if the superior court's decision is incorrect as a matter of law, we may uphold the decision if there is any other ground which, as a matter of law, supports the result reached by the superior court. *Carlson v. State*, 598 P.2d 969, 973 (Alaska 1979).

constitutional mandate. Specifically, we adopt a test akin to that established in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982):

> *Harlow* establishes a two-part test. First, the court must look to currently applicable law and determine whether that law was clearly established at the time the action in question occurred. [*Id.* at 818, 102 S.Ct. at 2738.] If the law was not clearly established, the public official will be immune. Second, if the law was clearly established at the time the action occurred, the public official must show that, because of extraordinary circumstances, "he neither knew nor should have known of the relevant legal standard." *Id.* at 819, 102 S.Ct. at 2738.

*Unity Ventures*, 631 F.Supp. at 207. The *Harlow* Court also required that the government officials be performing discretionary functions in order to receive immunity. 457 U.S. at 818, 102 S.Ct. at 2738, 73 L.Ed.2d at 410. Likewise, in *Aspen* we explained that the official asserting immunity from liability must be acting within the scope of his authority and the action must be discretionary in nature. *See* 739 P.2d at 156–57. These must also be our initial inquiries in determining whether the assembly members are entitled to immunity here. If we find that they acted within the scope of their authority and that their actions were discretionary, then we must assess whether the law allegedly violated by those actions was clearly established at the time of the alleged violation.

As to the first question, an official acts within his scope of authority if

> "the occasion [is] such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him."

... [A]s long as the actions were, on their face, within the scope of his authority, the fact that ... they were performed with unlawful intent is irrelevant. *Id.* at 154 (quoting *Barr v. Matteo*, 360 U.S. 560, 572, 79 S.Ct. 1335, 1340, 3 L.Ed.2d 1434, 1441–42 (1959) (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir.1949), *cert. denied*, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed.2d 1363 (1950))).

That the assembly members here allegedly committed knowing violations of the charter and ordinance provisions is not relevant to the determination of whether the acts were within their scope of authority; the critical question is whether the assembly was vested with the authority to award a construction contract to a party other than the lowest qualified bidder.

At the time the contract was being considered by the assembly members, CCBJ § 53.50.090 excepted from the requirement that competitive sealed bidding be used to award contracts both contracts for professional or specialized services such as architects and engineers, and contracts in circumstances where the call for competitive bidding was "unavailing." [11] Thus, it was within the assembly members' authority to award certain public improvement contracts on a non-competitive basis.

■ Here the assistant city-borough attorney apprised the assembly members of both of these exceptions to the competitive bid requirements of the CBJ ordinance. Based on federal practices relating to a similar federal exemption, he advised them that the "unavailing" exception would permit the award of contracts for "design-build" or "turn-key" projects without competitive bids, and also suggested to them that the parking garage and marine park project might fall within the professional service exemption. Even if, in awarding the contract to a party other than the low-

---

11. Section 53.50.090 provides in part:
EXCEPTIONS TO COMPETITIVE SEALED BIDDING AND SUBMISSION OF QUOTATIONS. The restrictions and provisions of this chapter shall not apply:
(a) To contracts involving the obtaining of professional or specialized services such as, but not limited to, services rendered by archi-

tects, attorneys, engineers, and other specialized consultants;
(b) Where calling for bids on a competitive basis is unavailing or impossible, including but not limited to situations where rates are set by statute or ordinance or where like items are traded in, or where used items are being purchased.

est bidder, the assembly members relied on this interpretation of the exceptions to the competitive bidding requirement to apply to this project when the project in fact did not fall within either exception, the assembly members nonetheless acted within the scope of their authority. *See Bridges v. Alaska Housing Auth.,* 375 P.2d 696, 702 (Alaska 1962) (public officers acting within scope of official duties are immune from liability for damages resulting "because of an erroneous interpretation and application of law"). Accordingly, we hold that the assembly members acted within the scope of their authority in awarding the parking garage and marine park contract on a non-competitive basis, to a party other than the lowest qualified bidder.

Next, we must determine whether the assembly members' acts were discretionary. As we explained in *Aspen:*

> [W]e have spoken of discretionary acts as those involving a mistake in "judgment or discretion, or because of an erroneous interpretation and application of the law," or "discretionary judgment-policy decisions." Moreover, in *Haley* we defined discretionary acts as "those requiring 'personal deliberation, decision and judgment,'" while ministerial acts were described as acts amounting "'only to obedience of orders, or the performance of a duty in which the officer is left with no choice of his own.'"

739 P.2d at 155 (citations omitted). Breck argues here that the assembly members' act was ministerial because they had no discretion to approve the award of the contract to other than the lowest qualified bidder and "had no judicial power or discretion as to the interpretation of the law."

This argument is similar to one we rejected in *Aspen.* Aspen argued that a specific decision rejecting a permit application was not a policy or discretionary action, but rather a non-discretionary action implementing standards contained in statutes and regulations. *Id.* at 156. We responded:

> Aspen mischaracterizes the action which is the actual subject of our inquiry: the issue to be determined here is not whether Aspen's permit applications were improperly rejected, but whether Governor Sheffield's actions in ordering their rejection was [sic] an act requiring "personal deliberation, decision and judgment."

*Id.* We proceeded to decide that the governor was engaged in supervisory authority over his subordinates, that when and whether to exercise supervision and the extent thereof were policy decisions requiring personal deliberation and judgment, and that therefore the acts in question were discretionary in nature. *Id.*

■ Our inquiry thus becomes whether the assembly's approval of the contract award required "personal deliberation, decision, and judgment." It is obvious to us that the assembly members had to deliberate and exercise their judgment in determining whether or not to approve the award of the contract, and we therefore find their actions discretionary.[12]

■ Our conclusions that the assembly members were acting within the scope of their authority and exercising a discretionary function dictate that the members are thus entitled to qualified immunity if their conduct in awarding the contract did not violate clearly established law. At the time of the contract award in May 1984, no case law existed interpreting the CBJ Charter, CCBJ Chapter 53.50, or the equivalent state law provision. The legislators were advised by the assistant city-borough attorney that the "design-build" or "turn-key" method of contract procurement was defensible. In light of these facts, we cannot

---

12. This result comports with federal cases finding the award of contracts to be a discretionary function under the Federal Torts Claims Act. *See, e.g., Scanwell Laboratories v. Thomas,* 521 F.2d 941, 948 (D.C.Cir.1975), *cert. denied,* 425 U.S. 910, 96 S.Ct. 1507, 47 L.Ed.2d 761 (1976) (discretionary function exception applies where contracting officer's obligation not purely ministerial, notwithstanding possible abuse of discretion in ignoring bidding regulations); *Lipka v. United States,* 249 F.Supp. 213, 216 (N.D.N.Y. 1965), *aff'd on other grounds,* 369 U.S. 288 (2d Cir.1966), *cert. denied,* 387 U.S. 935, 87 S.Ct. 2061, 18 L.Ed.2d 997 (1967) ("The award of a contract by government officials is the exercise of a discretionary function which is excepted from the governmental waiver of immunity for its negligent acts....").

say that the competitive bidding procedures then constituted clearly established law. Therefore, we hold that the assembly members are entitled to qualified immunity for the administrative acts in question and thus affirm the superior court's grant of summary judgment on this rationale.

### B. Does Section 9.13 of the CBJ Charter Abrogate the Assembly Members' Common Law Immunity?

The assembly members argue that CBJ Charter § 9.13 does not apply to them because they are not "officers or employees" within the meaning of this section and only "officers or employees of the municipality who knowingly authorize or make ... [illegal] payments" are liable. Breck responds that the charter provisions must apply to them since they are the only officials authorized to approve a contract in excess of $50,000.

We need not reach the question of whether the charter applies to the assembly members if the charter evinces no intent to abrogate the common law immunity of CBJ officials. Cf. Tenney v. Brandhove, 341 U.S. 367, 376–77, 71 S.Ct. 783, 788–89, 95 L.Ed. 1019, 1026–27 (1950) (assessing whether Congress intended to abrogate existing common law concerning legislators' immunity in passing civil rights statutes).

Here the charter provision itself imposes liability upon officers or employees for "knowingly" authorizing illegal payments —that is, payments made in violation of the charter. In our view, this comports with the standard which imposes liability on public officials for actions "done maliciously, corruptly or in bad faith," see Aspen, 739 P.2d at 158, and does not reveal any intent to abrogate common law immunity.[13] Therefore, our finding that the assembly members are entitled to qualified immunity suffices to prevent the imposition of liability here. See 3 C. Sands, Statutes and Statutory Construction § 61.01, at 41 (4th

ed. 1973), quoted in Hugo v. City of Fairbanks, 658 P.2d 155, 161 (Alaska App.1983) ("If a statute is intended to change the common law, then 'the legislative purpose to do so must be clearly and plainly expressed.'"). In conclusion, therefore, we hold that the legislators are immune from suit.

## IV. DID THE SUPERIOR COURT COMMIT REVERSIBLE ERROR IN DENYING BRECK'S MOTION TO FILE A REPLY PLEADING?

Breck claims that the trial court abused its discretion and denied her substantial justice in denying her leave to file a reply pleading to the assembly members' answer to her complaint. According to Breck, the court thereby excluded evidence that would have raised genuine issues of fact. She maintains that pro se litigants should not be held to the same standards as attorneys with respect to their pleadings and that the judge's delay in ruling on her motion prevented her from submitting the evidence in her opposition to the assembly members' motion for summary judgment.

■ Because the decision whether to allow a party to file a reply is committed to the trial court's discretion,[14] we will reverse the denial of Breck's motion here only if the court abused its discretion, Sheehan v. University of Alaska, 700 P.2d 1295, 1297 (Alaska 1985); that is, if the court "issu[ed] a decision which is arbitrary, capricious, manifestly unreasonable, or ... stems from an improper motive." Tobeluk v. Lind, 589 P.2d 873, 878 (Alaska 1979) (footnote omitted). Moreover, to succeed on appeal Breck must show prejudicial error. Loof v. Sanders, 686 P.2d 1205, 1209 (Alaska 1984); see Alaska R.Civ.P. 61. She must "demonstrate that the error, if any, had a 'substantial influence' on the outcome of the case." Loof, 686 P.2d at 1209 (citing Martinez v. Bullock, 535 P.2d 1200, 1206–07 (Alaska 1975)).

---

**13.** A provision imposing liability for merely negligent acts, for example, would evince such an intent.

**14.** Alaska R.Civ.P. 7(a) provides in part that no pleading other than those enumerated in the rule shall be allowed "except that *the court may order a reply to an answer* or a third-party answer." (Emphasis added.)

Apart from a counterclaim denominated as such, a reply to an answer ordinarily is unnecessary and improper, and the movant must demonstrate a substantial reason or necessity to justify the court ordering one. *See* 5 C. Wright and A. Miller, *Federal Practice and Procedure* § 1185, at 17–19 (1969) (footnotes omitted). Here it appears that Breck intended to accomplish two goals in replying to the defendants' answer: to clarify the acts she alleged to have violated the law, and to present evidence to contradict the denials of her allegations submitted by the assembly members. These goals are not a sufficient reason to allow a reply. Breck could clarify her complaint if necessary by amending it,[15] and she could present evidence rebutting the assembly members' denials at the hearing on the summary judgment motion or at trial. Therefore, we find no abuse of discretion in the superior court's refusal to grant Breck leave to file a reply.

We agree with Breck that the pleadings of *pro se* litigants should be held to less stringent standards than those of lawyers. *See Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652, 654 (1972) (per curiam). In this regard we note that several courts have explicitly imposed a duty on the trial judge to advise a pro se litigant of his or her right under the summary judgment rule to file opposing affidavits to defeat a motion for summary judgment. *See Hudson v. Hardy*, 412 F.2d 1091, 1094 (D.C.Cir.1968) (per curiam); *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir.1975) (per curiam). Likewise, we believe the trial judge should inform a *pro se* litigant of the proper procedure for the action he or she is obviously attempting to accomplish; here Breck should have been advised of the necessity of submitting affidavits to preclude summary judgment, and of the possibility of amending her complaint.

The trial court's failure so to advise Breck here is harmless. The evidence which she considers necessary was before the trial court by reference in her opposition to the summary judgment motion. Although she submitted only her individual affidavit in opposition to the summary judgment motion, Breck therein specifically directs the court to "Plaintiff's Response to Defendant's Answer," the reply pleading to which she had attached as exhibits the evidence which she now alleges that the trial court did not consider. Even where affidavits have not been submitted, the trial court still has a duty to consider the evidence referred to by the party opposing summary judgment. *Jennings v. State*, 566 P.2d 1304, 1310 (Alaska 1977) (where party presented no affidavits, "the superior court should have gone outside the pleadings to consider the entire setting of the case to the extent the material was brought to the court's attention by the parties on the motion."). There is no indication that the superior court here failed to fulfill that duty. Furthermore, Breck had a full opportunity to make her arguments in her summary judgment papers, and our review of the record convinces us that none of the evidence on which Breck relies raises a genuine issue of fact that would preclude summary judgment.

AFFIRMED.

---

**15.** It actually appears that Breck did not seek to alter her allegations, but merely sought to argue that the assembly members' characterization of her action as a challenge to the passage of ordinances was factually contrary to her assertion that the assembly violated a "mandatory duty" by awarding the contract.